**UNITED STATES of America**

v.

**Jerry PHELPS**

**No. 1:04–CR–41.**

United States District Court,
E.D. Tennessee,
at Chattanooga.

April 1, 2005.

Christopher D. Poole, Assistant U.S. Atty. Office, Chattanooga, TN, for United States of America.

Daniel J. Ripper, Luther—Anderson, PLLP, Anthony Martinez, Chattanooga, TN, for Jerry Phelps.

## *SENTENCING MEMORANDUM*

COLLIER, District Judge.

## I. INTRODUCTION

On March 4, 2005, the Court sentenced Defendant Jerry Phelps ("Defendant") to a term of 150 months imprisonment. The Court is now issuing this Memorandum in conjunction with the written judgment in this case so as to provide greater detail regarding the reasons for the specific sentence imposed and to communicate the methodology the Court intends to follow in all future cases[1] in light of the Supreme Court's recent ruling in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged in a seven-count Superseding Indictment (Court File No. 9) with various drug and firearm offenses. On August 5, 2004, Defendant entered pleas of guilty without benefit of a written plea agreement to the first and seventh counts of the Superseding Indictment which charged him with conspiring to distribute and possess with intent to distribute more than five grams of cocaine base ("crack") in violation of 21 U.S.C. §§ 846, 841(a)(1), & 841(b)(1)(B), and possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Court File No. 26). Prior to Defendant's sentencing hearing, the United States Probation Office prepared a Presentence Investigation Report ("PSR"). Pursuant to the United States Sentencing Commission Guidelines Manual ("Guidelines"), the PSR assigned Defendant a total offense level of 23 and a criminal history category of V, resulting in an effective Guidelines imprisonment range of 144 to 165 months. Defendant appeared before the Court for sentencing on January 7, 2005, and did not offer any objections to the PSR which required a ruling or determination by the Court. As such, the Court found the PSR's Guidelines calculations were accurate and announced a sentence of 150 months, which fell in the middle of the applicable Guidelines range.

On January 12, 2005, before the written judgment was entered, the Supreme Court issued its long awaited ruling in *Booker*. Therein, the Supreme Court applied the principles of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington*, 542

---

1. The Court expects this memorandum will be helpful to future litigants before the Court in criminal cases. The methodology set forth in this memorandum should inform future liti- gants of the factors the Court will consider, the weight the Court will give to those factors, and the method the Court will use in determining an appropriate sentence.

U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), to the federal Guidelines and concluded the Guidelines violate the Sixth Amendment right to a jury trial where they provide for a sentence in excess of the maximum authorized by the facts established by a plea of guilty, a jury verdict, or a defendant's own admissions. *See Booker*, 125 S.Ct. at 756. The Supreme Court then remedied this violation by striking those provisions of the United States Code which made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), and set forth standards of review on appeal, 18 U.S.C. § 3742(e). *Booker*, 125 S.Ct. at 764–66. In light of *Booker*, Defendant requested the Court resentence him exercising its new-found discretion and treating the Guidelines as advisory. The Court granted Defendant's request and held a second sentencing hearing on March 4, 2005 (Court File No. 35). Since the regime under which the Court must now sentence Defendant has changed greatly, the Court will take this opportunity to detail how it arrived at Defendant's sentence in the new post-*Booker* world of federal sentencing.[2]

## III. SENTENCING METHODOLOGY

As a starting point, the Court will set out the methodology the Court believes now governs federal sentencing. Following *Booker*, the Guidelines are still valid and in effect, they are simply not compulsory. The Sentencing Commission remains in existence and still performs its authorized functions. Despite the advisory nature of the Guidelines, sentencing courts must continue to consult them and take them into account in rendering sentencing decisions. *See* 18 U.S.C. § 3553(a)(4). Since, as a logical matter, the Court can neither "consult" nor "consider" the advisory Guidelines range without first determining what that range is, the Court will continue to endeavor to determine the Guidelines range applicable to each case that comes before it. *See United States v. Crosby*, 397 F.3d 103, 115 (2nd Cir.2005) ("sentencing judge would commit a statutory error in violation of section 3553(a) if the judge failed to 'con-

2. The *Booker* court established an appellate review standard of reasonableness with respect to district courts' sentencing decisions. *See* 125 S.Ct. at 766. For this reason, sentencing courts are encouraged to explain their sentencing rationale in more detail. *See United States v. Jones*, 399 F.3d 640, 650 (6th Cir.2005) ("Accordingly, on remand, we encourage the sentencing judge to explicitly state his reasons for applying particular Guidelines, and sentencing within the recommended Guidelines range, or in the alternative, for choosing to sentence outside that range. Such a statement will facilitate appellate review as to whether the sentence was 'reasonable.' However, we take no position as to the content or extent of such a statement."). For this reason, some district courts are issuing written opinions in connection with those cases that come before them for sentencing. *See e.g., United States v. Jaber*, 362 F.Supp.2d 365 (D.Mass.2005), *available at http://sentencing. typepad.com/sentencing law and policy/files/ gertner_ jabarmomohsen-tenmemo. pdf*. Such a course of action is neither practical nor feasible for this Court. The Court's practice is to set sentencing hearings on a date certain every other week. On any given sentencing date the Court is likely to have at least eight and as many as fifteen separate defendants appearing for sentencing. This means the Court imposes sentences upon sixteen to twenty-five defendants per month. Due to the Court's increasing criminal caseload, it has on occasion been necessary to set additional dates in order to accommodate the docket. If the Court were to issue written opinions in connection with each and every sentencing, the Court would soon find itself turning such opinions out on a daily basis. As such, the Court intends memorandums like the present one to be the exception rather than the rule. However, in order to facilitate appellate review the Court will strive to state its conclusions and rationale on the record and in considerable detail when imposing a sentence.

sider' the applicable Guidelines range"); *United States v. Hughes*, 396 F.3d 374, 378–79 (4th Cir.2005) ("Consistent with the remedial scheme set forth in *Booker*, a district court *shall* first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines.") (emphasis added). This is the first step in the process and, in most cases, will require the Court to proceed just as it always has, ruling on objections to the PSR and resolving any factual disputes to the extent they would affect the applicable Guidelines range. In doing so, the Court will continue to apply the preponderance of the evidence standard and will not consider itself restricted by the Federal Rules of Evidence. *See* 18 U.S.C. § 3661; Fed.R.Evid. 1101(d)(3); U.S.S.G. § 6A1.3(a). However, in some cases the Court may find it desirable to identify more than one possible Guidelines range, contiguous or otherwise, and consider each in determining a sentence. *See Crosby*, 397 F.3d at 112 (noting that since Guidelines are no longer mandatory, a district court has leeway to avoid making certain factual determinations by concluding either of two Guidelines ranges apply, proceeding to impose a non-Guidelines sentence, and announcing it would have imposed the same sentence irrespective of which range was ultimately found to be correct).

■ After determining the applicable Guidelines range, the second step in the process requires the Court to determine whether any departures from the advisory Guidelines range are appropriate pursuant to the Guidelines and/or the Sentencing Commission's policy statements. *See* 18 U.S.C. § 3553(a)(4) & (5); U.S.S.G. § 5K. In order for the Court to fully consider the Guidelines and policy statements in a given case, the advisory Guidelines range must necessarily include a determination with respect to any departures contemplated or provided for thereunder. Overlooking the departure aspects of the Guidelines or treating the Court's new *Booker* discretion as a substitute for or overlay of existing departure practice would sever a critical component of the Guidelines scheme, thus rendering any resulting advisory Guidelines range incomplete. Determination of departures also allows the Sentencing Commission to better fulfill its role in making recommendations to Congress and in making periodic adjustments to the Guidelines in light of actual sentences being imposed.[3] Consideration of an advisory Guidelines range arrived at through piecemeal application of the Guidelines no more complies with §§ 3553(a)(4) and (5) than ignoring the Guidelines entirely. Moreover, applying the Guidelines in such

---

**3.** In establishing the Sentencing Commission, Congress stated the purposes of the Sentencing Commission were to "(1) establish sentencing policies and practices for the Federal criminal justice system ... and (2) develop means of measuring the degree to which the sentencing, penal, and correctional practices are effective in meeting the purposes of sentencing ...." 28 U.S.C. § 991(b).

In fulfilling its statutory purposes, the Sentencing Commission was authorized and directed to both revise the Guidelines and make recommendations to Congress. 28 U.S.C. § 994(*o*) provides, in part:

The Commission periodically shall review and revise, in consideration of comments and data coming to its attention, the guidelines promulgated pursuant to the provisions of this section.

Correspondingly, 28 U.S.C. § 994(r) provides, in part:

The Commission, not later than two years after the initial set of sentencing guidelines promulgated ... goes into effect, and thereafter whenever it finds it advisable, shall recommend to the Congress that it raise or lower the grades, or otherwise modify the maximum penalties, of those offenses for which such an adjustment appears appropriate.

a selective manner would merely serve to validate and/or exacerbate many of the long-standing criticisms of the Guidelines (*e.g.*, overemphasis on prosecutorial charging decisions, unduly harsh one-size-fits-all sentencing ranges, little to no accounting for particularized characteristics of offense and offender, *etc.*), thus justifying non-Guideline sentences where a full and complete application of the Guidelines might well have resulted in a fair and just sentence. *See generally United States v. Green,* 346 F.Supp.2d 259 (D.Mass.2004) (offering blistering pre-*Blakely* critique of Guidelines and federal criminal practice thereunder).

■ Accordingly, the Court will continue to apply established departure law and procedures in determining the advisory Guideline range and counsel for both parties should continue to file formal motions for downward or upward departures bringing to the Court's attention any factor which they believe warrants a departure under the Guidelines. Additionally, in appropriate cases and upon notice to the parties, the Court may *sua sponte* depart from the applicable Guidelines range. *See Burns v. United States,* 501 U.S. 129, 138–139, 111 S.Ct. 2182, 2187, 115 L.Ed.2d 123 (1991) (holding district court may depart from applicable Guidelines sentencing range based upon a ground not identified in the PSR or in a prehearing submission by either party so long as it provides the parties "reasonable notice" it is contemplating such a ruling).

The third and final step requires the Court to determine the appropriate sentence. Section 3553(a) directs the court to impose a sentence "sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2) of this subsection," that is to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide needed training, medical care, or other correctional treatment in the most effective manner. *See also* 18 U.S.C. § 3551(a) (stating defendants "shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case"). These are the purposes of criminal sentencing and the Court is charged with determining how these objectives are best served in a given case. In making such a determination, the statute states the Court "shall consider" the following seven enumerated factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1);

(2) the *need* for the sentence imposed to accomplish each of the previously enumerated purposes of sentencing, § 3553(a)(2);

(3) the kinds of sentences available, § 3553(a)(3);

(4) the Guidelines promulgated by the Sentencing Commission, § 3553(a)(4);

(5) any pertinent policy statement issued by the Sentencing Commission, § 3553(a)(5);

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6); and

(7) the need to provide restitution to victims, § 3553(a)(7).

■ Accordingly, the advisory Guidelines range is one of several factors the Court must consider in determining what

sentence to impose in a particular case. However, saying the Court must determine and consider the advisory Guidelines range is a much simpler proposition than identifying and communicating the weight that will be given that range and the circumstances under which the other § 3553(a) factors will justify a non-Guidelines sentence. Some courts have resolved to treat the advisory Guidelines range as *the* overriding sentencing factor and have indicated they will venture outside that range only in exceptional cases. *See United States v. Wanning,* 354 F.Supp.2d 1056, 1060, 1062–63 (D.Neb.2005) (treating advisory Guidelines range as "presumptively reasonable" and entitled to "substantial weight" and suggesting courts should only "deviate" from customary application of the Guidelines when "another sentencing range from within the Guidelines more accurately (and honestly) describes the real offense behavior"); *United States v. Wilson,* 350 F.Supp.2d 910, 925 (D.Utah 2005) (*Wilson I*) (giving "heavy weight" to the advisory Guidelines range and stating court "will only deviate from those Guidelines in unusual cases for clearly identified and persuasive reasons"); *United States v. Musick,* No. 2:03–CR–62, Court File No. 620, slip op., at 2 (E.D.Tenn. Feb. 2, 2005) (Greer, J.) (stating advisory Guidelines range is "entitled to substantial weight" and stating court will sentence outside that range "[o]nly when [it is] clearly outweighed by some other factor(s) set forth in § 3553(a)"). Other courts have expressed an intent to use their new-found discretion much more freely and readily. *See United States v. Myers,* 353 F.Supp.2d 1026, 1028–30 (S.D.Iowa 2005) ("This Court will endeavor ... to square the real conduct presented by the evidence presented concerning a particular defendant, with the public interests expressed through the sentencing statute, in order to deliver a judgment in a manner as even-handed and reasonable as humanly possible."); *United States v. Ranum,* 353 F.Supp.2d 984, 987 (E.D.Wis.2005) ("[C]ourts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors.").

■ Contrary to the sense conveyed by the district courts in *Wanning* and *Wilson,* the Court does not believe the advisory Guidelines range should be treated as a *starting point* or necessarily understood as representing a presumptively reasonable sentence in a given case. The Guidelines are one of a universe of factors pertinent to the Court's sentencing decisions, albeit a significant or substantial factor, and nothing in *Booker* or 18 U.S.C. § 3553(a) operates to make the advisory Guidelines range uniquely primary among those factors. However, this is not to say the Court is now at liberty to utilize its new-found discretion to impose a non-Guidelines sentence for any reason which can be phrased within the context of one of the § 3553(a) factors. *See Crosby,* 397 F.3d at 113–14 ("[I]t would be a mistake to think that, after *Booker/Fanfan,* district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum."). Nor does the Court believe *Booker* empowers the Court to exercise its discretion to reevaluate the full panoply of legal, constitutional, and policy considerations bearing upon criminal sentencing and devise its own unique sentencing regime based upon its subjective interpretation and balancing of those considerations. *But cf. United States v. Huerta–Rodriguez,* 355 F.Supp.2d 1019, 1025, 1028–29 (D.Neb.2005) (holding that post-*Booker* the upper limit of a lawful

sentence is the highest point within the statutory range that is "reasonable" and concluding "it can never be 'reasonable' to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt"); *United States v. Barkley*, No. 04–CR–119–H, slip op., at 9–14 (N.D.Okla. Jan. 24, 2005) (exercising discretion afforded by *Booker* so as to treat Guidelines as mandatory and require that any fact enhancing a defendant's sentence be either admitted by the defendant or found by a jury beyond a reasonable doubt).

Although the Guidelines and policy statements are not primary as such, they are significant for what they represent. The Guidelines and policy statements both contemplate and give effect to each of the other five § 3553(a) factors to one degree or another. The Guidelines and policy statements are themselves premised upon certain assessments and quantifications, both general and specific, of the nature and seriousness (if not the circumstances) of particular offenses, the history (if not characteristics) of particular defendants, and the need to promote respect for the law, provide just punishment, afford adequate deterrence, and avoid unwarranted sentence disparities. *See* 18 U.S.C. § 991(b); *United States v. Peach*, 356 F.Supp.2d 1018, 1020–21 (D.N.D.2005) (noting factors Sentencing Commission has been required to consider in developing Guidelines are "a virtual mirror image" of factors sentencing courts must consider under § 3553(a)).

The Guidelines and policy statements also reflect the considered judgment of Congress and the Sentencing Commission as to the weight and relevance of certain generalized criteria in criminal sentencing. Not only are these entities more representative than this Court of the various stakeholders in criminal sentencing (including perhaps most significantly the general citizenry), but they are also in a better position to offer judgments as to the presence and extent of certain traditional sentencing considerations with respect to classes of offenses and/or offenders. For example, it would be quite difficult if not a practical impossibility for the Court or the federal judiciary in general to evaluate and assess the need "to afford adequate deterrence to criminal conduct" (*i.e.*, general deterrence) in the context of any given statutory offense. *See* 18 U.S.C. § 3553(a)(2)(B). It is neither the purpose nor the province of the federal judiciary to gather evidence, hear testimony, and come to conclusions as to such matters, nor is it this Court's desire to do so.[4] Additionally, with respect to § 3553(a)(2)(A)'s call for sentences which reflect the seriousness of the offense, promote respect for the law, and provide just punishment, the conclusions of Congress and the Sentencing Commission are a much more accurate and consistent (though still imperfect) barometer of the present societal consensus as to these broadly phrased objectives of criminal sentencing than the subjective opinions of this Court on any given day could ever hope to be. Finally, because the nation's district courts are presided over by hundreds of judges sitting in different locales and each operating from their own individual professional and personal backgrounds and experiences, the only feasible way to provide any meaningful uniformity in federal sentencing, as called for in § 3553(a)(6), is for

---

**4.** Of course, the contrary is also true in that there are certain traditional sentencing considerations which the Court is uniquely capable of assessing and weighing in a given case (*e.g.*, the need to protect the public from further crimes of a particular defendant, the need to provide a particular defendant with vocational training, medical care, and/or correctional treatment, and the need to provide restitution to any victims).

this Court and others to give the advisory Guidelines some degree of enhanced weight in determining a fair, just, and reasonable sentence in a given case.

■■ All of these considerations persuade the Court the advisory Guidelines should be treated as a major and persuasive factor among the universe of considerations contemplated by § 3553(a). This is not to say the advisory Guidelines range is *per se* reasonable or that sentences should fall within that range absent some exceptional or extraordinary circumstance. To "consult" the Guidelines in this manner would result in a *de facto* mandatory Guidelines regime not readily distinguishable from that which the Supreme Court found violative of the Sixth Amendment in *Booker*. Rather, the Court believes the Guidelines should be understood as the result of a democratic and deliberative process designed to give tangible expression to the nation's collective penal philosophy, taking into account the assorted broad principles and ideals underlying criminal sentencing. It is not for this Court to second-guess those determinations or apply its own ideological gloss thereto; rather, the Court is charged with giving effect to those abstract policy, moral, and philosophical judgments and it best does so by faithfully and completely applying the Guidelines. However, Congress, the Sentencing Commission, and the Guidelines are inherently limited in their ability to account for all of the relevant § 3553(a) factors in all cases. Accordingly, the Court will treat the advisory Guidelines as controlling with respect to that of which they are capable of being and purport to be representative (*i.e.*, society's collective opinion as to the sort of sentence merited by a faceless defendant who has committed a particular offense under certain abstract circumstances), but will en-

deavor to render its own judgment as to the presence and weight of the various sentencing objectives in a particular case.

■ Generally speaking, the Court will impose a non-Guideline sentence where it finds such a sentence is sufficient, but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate specific and general deterrence, and provide the defendant with needed training, care, or treatment in the most effective manner. In doing so, the Court will give deference to the Guidelines where appropriate and consistent with congressional objectives, but will not defer to the Guidelines where the Court is in a better position to determine what sort of sentence would best serve the purposes enumerated in § 3553(a)(2) or where congressional intent would be fully served by a sentence other than that called for by the Guidelines. At all times, the Court will be guided by § 3553(a)'s general parsimony provision ("court shall impose a sentence sufficient, but not greater than necessary . . ."), the purposes and/or objectives of sentencing enumerated in § 3553(a)(2), and the congressional intent underlying the applicable Guideline provisions. For example, both the Guidelines and the Controlled Substances Act provide for gradations in punishment based on the type and quantity of controlled substance involved in the offense. In doing so, Congress has expressed its judgment that certain drugs present a more pernicious danger to society and should be punished more harshly. Because Congress is in an infinitely better position to make such determinations, the Court will defer to the Guidelines and decline to impose a non-Guideline sentence based upon arguments as to the subjective seriousness of one drug relative to anoth-

er.[5] By way of a contrary example though, the Court will consider imposing a non-Guidelines sentence in certain cases where U.S.S.G. § 4B1.1 ("Career Offender") technically applies. Section 4B1.1 represents the Sentencing Commission's implementation of Congress's desire to assure certain repeat offenders receive sentences "at or near the maximum term authorized." *See* 28 U.S.C. § 994(h); U.S.S.G. § 4B1.1, comment. (backg'd.). In passing this statutory directive, Congress intended to express its view that "substantial prison terms should be imposed on repeat violent offenders and repeat drug traffickers." *See* S.Rep. No. 225, 98th Cong., 2d Sess. 175 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3358. Accordingly, § 4B1.1 provides for greatly enhanced offense levels and criminal history categories for defendants convicted of a felony crime of violence or felony controlled substance offense who have at least two prior felony convictions for similar offenses. Many defendants meeting the definition of career offender are clearly dangerous to society as evidenced by the nature, number, frequency, and or recency of prior violent crime or drug trafficking convictions and should be incarcerated for as long as possible. However, it is not unusual that the technical definitions of "crime of violence" and "controlled substance offense" operate to subject some defendants to not just substantial, but extraordinary increases in their advisory Guidelines ranges. In some of these cases, the Court believes a non-Guideline

sentence may be sufficient, but not greater than necessary, to both comply with Congress's desire to punish recidivism and the purposes of sentencing set out in § 3553(a)(2). In the Court's experience, this is especially true in cases where the defendant's prior convictions are very old and he has demonstrated some ability to live for substantial periods crime free or in cases where the defendant barely qualifies as a career offender.

An additional question which has sparked some disagreement among district courts is the extent to which *Booker* frees district courts from the Guidelines' restrictions on consideration of certain specific offender characteristics. The policy statements contained in U.S.S.G. § 5H limit, and in some cases prohibit consideration of a defendant's age (§ 5H1.1), education and vocational skills (§ 5H1.2), mental and emotional conditions (§ 5H1.3), family ties and responsibilities (§ 5H1.6), race, sex, or religion (§ 5H1.10), lack of guidance as a youth (§ 5H1.12), and so on. Some courts have read *Booker* to open up the entire host of factors and considerations previously prohibited or limited by Section 5H of the Guidelines. *See Ranum*, 353 F.Supp.2d at 986 (holding Guidelines' restrictions on consideration of certain factors "cannot be squared" with § 3553(a)(1)'s directive to consider "the history and characteristics of the defendant" in determining an appropriate sentence); *see also United States v. West*, No. 03 CR. 508(RWS), 2005 WL 180930, at *2

---

**5.** The Court notes this position is not in conflict with § 3553(a)(6)'s command to consider the need to avoid unwarranted sentence disparities. Variances in the sorts of sentences received by marijuana offenders and methamphetamine offenders are not the sort of sentencing disparities the Sentencing Reform Act of 1984 was designed to avoid. Rather, Congress sought to avoid disparities between marijuana offenders and other marijuana of-

fenders with similar criminal backgrounds. Moreover, in finding certain controlled substances are relatively more serious and/or dangerous than others, Congress has necessarily concluded that sentencing disparities as between offenders committing offenses involving the more serious drugs and those committing offenses involving less serious drugs are, in fact, *warranted.*

(S.D.N.Y. Jan. 27, 2005) (concluding § 3553(a) requires courts "to consider a host of individual variables and characteristics excluded from those calculations called for by the Guidelines"). Other courts, however, have specifically rejected the argument that the advisory nature of Guidelines requires greater consideration of those offender characteristics previously limited or prohibited by the Guidelines. *See United States v. Wilson,* 355 F.Supp.2d 1269, 1276–82 (D.Utah 2005) *(Wilson II* ); *Wanning,* 354 F.Supp.2d at 1061. In *Wilson II,* Judge Cassell found no conflict between § 3553(a)'s general directive to consider a defendant's particular history and characteristics and the Guidelines' declaration that certain specifically enumerated offender characteristics should be given limited or no weight. *Id.* Indeed, there is nothing inherently illegal or unconstitutional about Congress restricting the sorts of facts or circumstances upon which courts may base sentencing determinations, unless perhaps if Congress prohibited consideration of any fact or circumstance *other than* the Guidelines.

While the Court finds Judge Cassell's analysis imminently reasonable in the context of the law discussed therein, neither *Wilson II* nor any of the other cases cited above appear to consider 18 U.S.C. § 3661, which provides as follows:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may received and consider for the purpose of imposing an appropriate sentence.

Although some courts have recognized the conflict between § 3661 and the policy statements reflected in U.S.S.G. § 5H, *see, e.g., United States v. Boshell,* 728 F.Supp. 632, 633–36 (E.D.Wash.1990) (concluding § 3661 supersedes contradictory Guidelines provisions and thus district court's departure discretion was unrestricted by U.S.S.G. § 5H), *vacated on other grounds,* 952 F.2d 1101 (9th Cir.1991), the longstanding general consensus appears to have been that § 3661 was to be read in light of § 3553(b)(1)'s command that district courts "shall impose a sentence of the kind, and within the range" directed by the Guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." Thus, § 3661 has been narrowly interpreted as a safety net of sorts from the compulsory nature of § 3553(b)(1), allowing district courts to consider any relevant information not already taken into consideration by the Guidelines.[6] *See United States v. Baird,* 218 F.3d 221, 227 (3d Cir.2000); *United States v. Fairman,* 947 F.2d 1479, 1482 (11th Cir.1991); *see also Williams v. United States,* 503 U.S. 193, 200, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992) ("[I]t is an incorrect application of the Guidelines for a district court to depart from the applicable sentencing range based on a factor that the Commission has already fully considered in establishing the guideline range or . . . on a factor that the Commission has expressly rejected as an appropriate ground for departure."); U.S.S.G. § 1B1.4, comment. (backg'd).

■ In the wake of *Booker,* however, § 3553(b)(1) is no more. In his remedial majority opinion, Justice Breyer explicitly

---

**6.** Interestingly, § 3661 has been simultaneously read as an expansive gloss on the Guidelines' relevant conduct provisions, *see* U.S.S.G. § 1B1.3, so as to permit consideration of a wide scope of information, most notably acquitted conduct. *See United States v. Watts,* 519 U.S. 148, 151–54, 117 S.Ct. 633, 635–36, 136 L.Ed.2d 554 (1997).

invalidated § 3553(b)(1) and excised it from the Sentencing Reform Act of 1984 and the United States Code. *Booker,* 125 S.Ct. at 764. As such, there now appears to be no countervailing statutory provision against which the broad language of § 3661 must be balanced. While it is entirely reasonable to interpret a broadly-phrased statute narrowly in the face of a seemingly contradictory statute passed by Congress at the same time,[7] it is quite another matter to give credence to regulatory pronouncements which seek to accomplish precisely what one of their statutory predicates prohibits. The Court need not delve into the details of the modern nature of the Guidelines and the continuing force of the holding in *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (holding Guidelines do not violate separation of powers), in order to conclude a statutory mandate takes precedence over subsequent conflicting directives from the Sentencing Commission, no matter how deafening Congress's silence might be. *Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (indicating legislative regulations are invalid where "manifestly contrary to the statute"); *but see Wilson II,* 355 F.Supp.2d at 1276 (lending great weight to congressional inaction in concluding Guidelines "generally reflect congressional purposes"); *Wanning,* 354 F.Supp.2d at 1061 ("[J]udges cannot reasonably conclude that

Congress willfully or negligently allowed Guideline ranges to be implemented that contradicted the statutes that Congress enacted for the purpose of setting sentencing goals.").

In any event, the Guidelines' restrictions on consideration of offender characteristics are not actually all that great. The only factors which are prohibited entirely are race, sex, national origin, creed, religion, and socio-economic status, which U.S.S.G. § 5H1.10 declares to be "not relevant in the determination of a sentence." The Guidelines do not broadly declare any other factors irrelevant to the determination of a *sentence,* though certain factors are declared irrelevant to a determination of whether a *departure* is warranted (*e.g.,* addiction to gambling, lack of guidance as a youth, disadvantaged upbringing) and others are deemed "not ordinarily relevant" to *departures* (*e.g.,* age, education and vocational skills, mental and emotional condition, employment record, prior good works). Thus, with the exception of those factors set out in § 5H1.10, the policy statements do not even purport to restrict the Court's exercise of its *Booker* discretion in determining sentences.[8]

▮▮▮ Accordingly, the Court concludes it must now interpret § 3661 literally and consistent with its plain meaning and, as a result, the Court will not consider itself bound by the provisions of

---

7. Both §§ 3553(b)(1) and 3661 were encompassed within the Sentencing Reform Act of 1984, though the two provisions were not technically *created* together since that Act merely renumbered a previously existing provision, former § 3577, as § 3661. *See* Pub.L. No. 98–473, Title II, §§ 212(a)(1) & (2), 98 Stat.1987, 1989 (1984).

8. The Court acknowledges this is a fine distinction based upon the fact all of the policy statements except for § 5H1.10 are phrased in the context of departures rather than ulti-

mate sentence determinations. The nature of the language is likely more a reflection of Congress and the Sentencing Commission's understanding of the Guidelines as mandatory than a concerted decision to not limit the discretion of district courts to sentence outside the Guidelines. Nevertheless, the Court finds the distinction appropriate and concludes the language and nature of the policy statements contained in § 5H render them inferior to the statutory directives which guide the Court's sentencing decisions.

U.S.S.G. § 5H in exercising the discretion afforded by *Booker*. Nevertheless, the Court declines to treat §§ 3553(a)(1) and 3661 as giving defendants carte blanche to argue for a sentence based upon a full range of offender characteristics as such. It is important to distinguish between the *purposes* of sentencing, as proclaimed in § 3553(a) by reference to subsection (a)(2) (*e.g.*, reflect seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, *etc.*), and the *factors* relevant to a determination of how those purposes are best served in a given case as set out in § 3553(a)(1)-(7). The primary command of the statute is to impose a sentence compliant with the enunciated purposes of criminal sentencing, while the secondary command is to consider each of the seven factors as they pertain to the case at bar, including the need for the sentence imposed to reflect each of those purposes. *See* 18 U.S.C. § 3553(a) ("The court *shall* impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" and, "in determining the particular sentence to be imposed, shall consider ..."); *see also* 18 U.S.C. § 3551(a) ("defendant[s] *shall* be sentenced ... so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case"). Therefore, a particular offender characteristic or offense circumstance has no relevance as such, but only becomes relevant to the extent it implicates one of the enumerated purposes or objectives of sentencing. The Court can conceive of no possible way in which a defendant's race, sex, national origin, creed, or religion could ever become relevant to achieving one of the purposes of criminal sentencing. Moreover, all of these characteristics carry constitutional implications, therefore, the Court will not entertain any sentencing arguments premised upon any of these offender characteristics.

■ Socio-economic status, however, is another matter. Unlike the other factors listed in § 5H1.10, classifications based upon such considerations are not constitutionally suspect. *See Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 457–62, 108 S.Ct. 2481, 2487–89, 101 L.Ed.2d 399 (1988) (applying rational basis review to statute disparately impacting rich and poor). In light of notions of fundamental fairness which dictate that the courts treat rich and poor alike and the ease with which socio-economic distinctions can quickly become proxies for more invidious discrimination, the Court is leery of relying upon such characteristics in imposing judgment on criminal defendants. Nevertheless, the Court can conceive of circumstances in which socio-economic considerations would indeed be relevant to a determination of what sort of sentence constitutes just punishment, promotes respect for the law, and affords adequate deterrence. Thus, the Court will leave the door open to such arguments, though the Court cautions that such considerations do not invariably run in favor of defendants and may well justify a *higher* sentence in certain cases.

■ In summary, the Court will impose a sentence in each case which is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate specific and general deterrence, and provide the defendant with needed training, care, or treatment in the most effective manner.[9] In

---

9. The Court notes it is not at all sure how to reconcile the statutory designation of provi-

determining an appropriate sentence, the Court will calculate the advisory Guidelines range and consider that range along with each of the other factors enumerated in § 3553(a). The Court will treat the Guidelines as neither the beginning nor the end of the analysis, but as only one of a universe of considerations relevant to sentencing. However, the Court will give deference to the Guidelines where they can be said to represent a societal judgment as to a matter which Congress is in an equal or greater position than the Court to evaluate. The Court will entertain arguments for a non-Guidelines sentence premised on any considerations except race, sex, national origin, creed, and religion, but only to the extent such considerations are relevant to one or more of the purposes of sentencing enumerated in § 3553(a)(2). The Court anticipates this methodology will produce some sentences below the applicable advisory Guidelines range, some above that range, and many consistent therewith. Parties should continue to file objections to the PSR and motions for departure just as they always have, but at the same time should also seek to identify and expand upon those facts which may justify a non-Guideline sentence in a given case. Every attempt should be made to bring such information to the attention of the United States Probation Office so that it may be incorporated into the PSR and the Court can have as complete and accurate an understanding of both the offense and the offender prior to convening court on the day of sentencing.

## IV. DISCUSSION

At this point and in light of the sentencing methodology set forth above, the Court will proceed to explain its sentencing decision with respect to Defendant.

### A. Advisory Guidelines Range

The PSR attributed Defendant with a total of 5.9 grams of cocaine base and an additional 3.4 grams of cocaine hydrochloride, which it then converted to 118.68 kilograms of marijuana equivalent (PSR ¶ 15). For offenses involving at least 100 kilograms but less than 400 kilograms of marijuana, the Guidelines provide for a base offense level of 26. U.S.S.G. § 2D1.1(c)(7). The PSR then reduced the base offense level by three pursuant to U.S.S.G. § 3E1.1 to reflect Defendant's acceptance of responsibility, in the process assuming the Government would move for the third point (which it did) (PSR ¶¶ 18, 27). Defendant's five prior criminal convictions and the fact he was on probation when he committed the offenses of conviction resulted in a total of 12 criminal history points, placing Defendant in criminal history category V (PSR ¶¶ 33–40). A total offense level of 23 and a criminal history category of V result in a Guidelines imprisonment range of 84 to 105 months. However, because the seventh count of the Superseding Indictment carries a mandatory consecutive 60–month sentence under 18 U.S.C. § 924(c)(1)(A)(i), Defendant's effective Guidelines range is 144 to 165 months. Defendant did not object to these calculations or any of the other statements of fact contained in the PSR.

sion of "educational or vocational training, medical care, or other correctional treatment in the most effective manner" as one of the primary purposes of sentencing, *see* 18 U.S.C. §§ 3551(a) & 3553(a), the statutory directive to consider the need for such services in fashioning a sentence, § 3553(a)(2), and the statutory declaration that "imprisonment is *not* an appropriate means of promoting correction and rehabilitation," § 3582(a), with the rather compelling legislative history indicating the Sentencing Reform Act of 1984 was premised upon a philosophical and empirical rejection of the rehabilitative model in favor of ideals of deterrence and incapacitation. *See Wilson II,* 355 F.Supp.2d at 1282–84.

## B. Departures

Neither the Government nor Defendant moved for a departure and the Court did not identify any basis for doing so in this case.

## C. Imposition of Sentence

 The PSR and the factual basis in support of Defendant's guilty plea indicate that officers executing search warrants found handguns and drugs in residences used or occupied by Defendant on two separate occasions, once on March 6, 2003, and again, slightly less than a year later, on March 3, 2004. Quantities of marijuana and both powder and crack cocaine were located and seized by the officers, but Defendant admitted to selling only crack cocaine. There are a number of factors about this offense that raise concern. First, the offense involved the sale of crack cocaine. The devastating effects of crack cocaine on certain segments of our population need no description here and Congress has indicated its concern about the evils of crack cocaine both through legislation and through its instructions to the Sentencing Commission that those defendants who traffic in crack cocaine should receive substantially greater sentences than those who deal in other drugs. As the Court previously noted in discussing its sentencing methodology, this is a matter upon which Congress is in a far more advantageous position to opine upon and the Court will defer to the Guidelines' quantification of the evils associated with crack cocaine as such.

Second, the Court considers it an aggravating factor that Defendant's criminal activities took place over an extended period of time. The first search was conducted approximately one year before the second search, and officers discovered a remarkably similar scene on both occasions. Thus, there is no reason to believe Defendant's criminal conduct was isolated and every indication is that trafficking in crack cocaine was a way of life for Defendant, if not his primary means of subsistence. Although Defendant was charged with and pleaded guilty to conspiracy to distribute crack cocaine, the advisory Guidelines range does not account for the continuing and protracted nature of Defendant's criminal conduct. Further, the PSR only held Defendant accountable for the quantities of cocaine (both powder and crack) which were actually seized during the two searches, a drug quantity that most likely underrepresents the full scope of Defendant's criminal conduct over the course of the conspiracy charged in the Superseding Indictment. Setting this fact aside, though, the Court has no reason to believe Defendant was involved in any high-level drug transactions or was anything but a street seller of crack cocaine. Thus, while Defendant's offense is certainly serious, it does not qualify as the most serious sort of criminal conduct which would constitute a violation of the same statutory provisions.

Third, during each search officers found handguns present, a Sig Sauer P226 pistol on March 6, 2003, and a loaded Hi–Point 9 mm pistol on March 3, 2004. The dangers to the public inherent in drug trafficking activity are enhanced when firearms are possessed or utilized in conjunction therewith. However, Congress has recognized this danger and has provided for a mandatory consecutive 60–month sentence where a defendant is convicted of a § 924(c) offense. Accordingly, the nature and circumstances of Defendant's offenses suggest his criminal conduct was both serious and ongoing and that Defendant had little respect for the law and was not deterred by the first search.

With respect to the history and characteristics of Defendant, the Court notes Defendant, though only 26 years old, has a

substantial prior record. The PSR reports five prior convictions: (1) in December 1996, at age 18, Defendant was arrested for and convicted of possession of crack cocaine (PSR ¶ 33); (2) in July 1997, at age 19, Defendant was arrested for and ultimately convicted of theft of property (PSR ¶ 34); (3) in March 1998, at age 20, Defendant was arrested for and ultimately convicted of auto theft, resisting arrest, and assault on police (PSR ¶ 35); (4) in July 1998, at age 20, Defendant was arrested for and ultimately convicted of domestic assault (PSR ¶ 36); and (5) in June 2001, at age 23, Defendant was arrested for and ultimately convicted of theft of property, burglary, and aggravated assault (PSR ¶ 37). The PSR also reflects Defendant has been arrested on seven different occasions, but none of those arrests led to convictions. Some of these arrests involved robbery, possession of crack cocaine, assault, aggravated burglary, aggravated assault, and unlawful carrying or possession of a weapon (see PSR ¶¶ 41–47). Thus, Defendant's history reflects a consistent and prolonged proclivity to engage in criminal conduct, a course of conduct which has not been deterred by previous encounters with law enforcement and the courts. The Court additionally finds it of significance that the more recent of Defendant's involvements with law enforcement have all involved some degree of violence or threats of violence and firearms have been associated with much of his prior criminal conduct.

Also of concern to the Court is Defendant's lack of a stable employment history. Defendant reports having worked for a cleaning service, in fast food, for a temporary agency, and for a food processing company, but the Probation Officer could only verify some of Defendant's prior employment (see PSR ¶¶ 58–61). At best, Defendant has worked sporadically. The highest yearly income his social security records show for the last ten years is only $1,278 in the year 2000 (PSR ¶ 62). Defendant's grades in school were poor and he dropped out of high school in either the 9th (school records) or 11th grade (his contention) (PSR ¶ 57). However, according to Defendant, he attended Job Corps in Knoxville, Tennessee for approximately seven months at the age of 16 where he took building maintenance courses (id.). There is no indication Defendant has made an effort to return to school or to obtain a GED. Nor has Defendant demonstrated a high level of responsibility in his personal and familial relationships. Defendant has a history of substance abuse, including marijuana and both powder and crack cocaine, and does not appear to have ever completed any treatment programs (PSR ¶¶ 55–56). Defendant has three children, all of whom he claims to see regularly, but only two of which he reports supporting by paying child support (see PSR ¶¶ 50, 52). However, Defendant's credit report indicates he owes in excess of $6,000 in past due child support payments (PSR ¶ 63).

In sum, the record contains much negative evidence about Defendant's character and gives no indication he is prepared to renounce his criminal activity and conform his behavior to societal norms and expectations. Weighing in Defendant's favor, however, is his demeanor in accepting responsibility for his crimes before the Court, specifically at his re-sentencing hearing where Defendant appeared both genuinely remorseful and cognizant of the effects of his actions on others. Additionally, it appears Defendant has met with the Government and provided some information, though the accuracy and value of that information cannot be evaluated at this time. This is another indication of remorse for his behavior. Nevertheless, the Court finds a strong need to protect the public from potential future crimes of

Defendant. This need is further enhanced by the fact Defendant's offenses of conviction involve drug trafficking activities, crimes which present an especially significant danger to the public and a high degree of recidivism. Accordingly, the Court believes incarceration is necessary in this case in order to promote respect for the law and provide just punishment. The Court further believes the sentence must be sufficiently severe so as to both protect the public from future crimes of Defendant and to deter others from engaging in similar criminal conduct. Additionally, the sentence should be sufficient to ensure Defendant is able to benefit from the substance abuse treatment programs offered by the Bureau of Prisons and to afford Defendant the opportunity to pursue his GED or gain other vocational training. Restitution is not an issue in this case.

As stated previously, the advisory Guidelines range in this case is 144 to 165 months. In light of all the considerations detailed above and in order to avoid unwarranted sentencing disparities, the Court believes this range is reasonable in this case. After consulting the Guidelines and taking them into account, after considering the factors raised by counsel for Defendant at his resentencing hearing, and after carefully considering each of the factors listed in § 3553(a), the Court concludes a sentence of 150 months is sufficient, but not greater than necessary to serve the purposes of sentencing as enumerated in § 3553(a)(2).

## V. CONCLUSION

For the reasons stated above and in accordance with the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553, the Court hereby **SENTENCES** Defendant to a term of 150 months imprisonment, to be followed by five years of supervised release and Defendant is ordered to pay a

special assessment of $200. Other conditions appear in the judgment.

A Judgment and Commitment Order shall enter.