# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 14, 2010      Decided October 26, 2010

No. 07-3006

UNITED STATES OF AMERICA,
APPELLEE

v.

ROLAND JAMES BAILEY,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00441-15)

*Richard K. Gilbert*, appointed by the court, argued the cause and filed the briefs for appellant.

*Suzanne G. Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Roy W. McLeese III*, *John P. Mannarino*, and *William J. O'Malley*, Assistant U.S. Attorneys. *Mary B. McCord*, Assistant U.S. Attorney, entered an appearance.

Before: GINSBURG and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  Roland Bailey appeals his conviction by a jury of possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii).  He contends the district court erred in denying his motion to suppress the drugs seized from his car, because the police had observed no criminal activity on his part and no crime had been reported, and thus neither probable cause nor articulable suspicion existed for his arrest. We hold the district court did not err in denying the motion to suppress. Appellant was "observed walking with and talking to a suspected drug dealer *at the very time and in the very place of the suspected drug dealing*," *United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991).  He responded to events in a manner that provided the police with "a *reasonable suspicion*, based on 'specific and articulable facts,'" *id*. at 401 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)), to detain him briefly.  Based on a prior purchase from the same drug dealer, the undercover officer could reasonably infer that appellant, after speaking with the drug dealer, had been waiting for the arrival of drugs he wanted to purchase when he drove into the alley after another car entered  the alley, briefly stopped adjacent to that car, and then promptly drove out of the alley.  Upon stopping appellant, the officers had probable cause to search his car, *see id.* at 402, because, as he concedes, a package containing cocaine was in plain view on the passenger's seat.

Appellant's other claim of legal error, based on *Brady v. Maryland*, 373 U.S. 83 (1963), is unpersuasive because he fails to show he was prejudiced by the government's late disclosure during trial that it could not locate a traffic ticket allegedly written when appellant was stopped for running a stop sign.

However, we remand the record to the district court for consideration of appellant's policy objection to the career offender provision of the U.S. Sentencing Guidelines, § 4B1.1,

in view of *Kimbrough v. United States*, 552 U.S. 85 (2007), which was decided after appellant's sentencing.  Upon remand the district court also can address appellant's objection that it never issued a promised order regarding false testimony presented to the grand jury.

**I.**

Detective King Watts testified that on July 3, 2003, while working as an undercover police officer, he was attempting to make another purchase of cocaine from Walter Webb.  In June 2002 Watts had purchased cocaine from Webb, who owned a restaurant at 1361 U Street, N.W.  The purchase had taken place in a storage shed in the alley behind the restaurant; the alley was to the east of the restaurant and could be entered from U Street and ran north-south, parallel to 14th Street.  On July 3, Watts drove to the restaurant around 3 p.m. and parked on the south side of U Street, across the street from the alley and Webb's restaurant, several cars behind Webb's truck in which Webb was sitting.  Watts was wearing monitoring equipment consisting of an Eagle recorder and body wire; he also had a cell phone with a "direct connect" feature.  Detectives Manley and Dessin were parked nearby on the north side of U Street.

Watts testified that when he arrived on U Street, he telephoned Webb, who told Watts to get into Webb's truck, which he did.  Webb asked Watts, "What's up boss?"  Eagle Tr. July 3, 2002 at 2.  A conversation ensued in which the two men discussed the price of the drugs Watts wanted to buy, Webb stating that the price had increased.  Webb appeared to make several phone calls attempting to find drugs at the price Watts offered to pay.  During the second call, Watts saw appellant come to the driver's side of Webb's truck.  Webb asked appellant, "What's up boss?" *Id*. at 5. Appellant's response was unintelligible on the Eagle recorder but Webb replied, "Okay, I

know it. I thought he told that guy 3:00." *Id*. Appellant then went and waited by his truck, which was parked on the north side of U Street. Shortly thereafter Watts and Webb agreed Webb would make the sale to Watts, and Webb indicated that someone would be bringing the drugs that Watts wanted: "I'mma [sic] call the guy and tell him to come on up here and bring that[,] and it shouldn't take me long[,] but I'll let you know just how long it'll take i[n] a few minutes." *Id*. at 6. Webb told Watts to wait in his car and went into the restaurant. Webb later came out of the restaurant and he and appellant went into the alley.

While waiting in his car, Watts called Detective Manley to advise him of what had transpired and that Webb had telephoned to say it would be less than 10 minutes and that the "guy is on his way." *Id*. at 7. A person later identified as Raven Carroll, Webb's supplier, drove into the alley in a black car, stopping beside the storage shed where Watts had previously brought drugs from Webb. About 20 to 30 seconds later, appellant emerged from the alley, got into his car, drove into the alley behind Webb's restaurant, and stopped parallel to Carroll's car. Watts told Manley about appellant, stating Webb was "getting ready to serve" him. *Id*. About two minutes after appellant went into the alley, Webb called Watts and told him to come into the alley. Watts notified Detectives Manley and Dessin that appellant was in the alley. No police officer was able to observe appellant's actions in the alley. When Watts pulled into the alley, Carroll's car was still there but appellant's car was not. About a minute later Carroll drove out of the alley. Watts made his planned purchase of cocaine from Webb inside the freezer located in the shed, where the previous buy had taken place. After appellant left the alley, he was stopped by Officer Shaw for rolling through a stop sign. The police seized a kilogram of cocaine in plain sight on the passenger seat of appellant's car.

On October 7, 2003, appellant and eighteen others were indicted for violating federal drug laws. The district court denied appellant's motion to suppress the drugs seized from his car, which were the basis for count 8 of the indictment, which charged possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii). The jury found appellant guilty on count 8, but acquitted him on count 1, which charged conspiracy to import one kilogram or more of heroin and five kilograms or more of cocaine, in violation of 21 U.S.C. § 963. The jury was unable to reach a verdict on count 2, which charged conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, and fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846; the government moved to dismiss count 2 after the district court declared a mistrial on that count. The district court denied appellant's motion for a new trial, which, among other things, renewed his suppression arguments about the drugs seized from his car based on inconsistencies between police officers' testimony at the suppression hearing and their testimony at trial. The district court also denied appellant's renewed motion to dismiss the indictment, which alleged, among other things, that Officer Manley had provided perjurious testimony to the indicting grand jury. The district court sentenced appellant, as a career offender under U.S.S.G. § 4B.1.1, to life imprisonment and eight years' supervised release.

## II.

Following an evidentiary hearing, the district court denied appellant's motion to suppress the cocaine seized from his car on two alternative grounds, each of which appellant contends raises separate legal issues. The district court ruled that the police had probable cause and/or reasonable suspicion to believe that appellant had been involved in a drug transaction, thus

giving the police grounds to stop appellant's car after it exited the alley behind Webb's restaurant. Alternatively, the district court ruled appellant was observed committing a traffic violation, justifying the stop. Based on Officer Delpo's trial testimony that he saw drugs on the passenger seat, appellant does not challenge the district court's finding that the drugs were in plain view. Rather, appellant challenges the district court's legal ruling on the ground that the record reveals an insufficient basis for either probable cause or reasonable suspicion that he was engaged in criminal activity.

When reviewing the denial of a motion to suppress physical evidence on Fourth Amendment grounds, the court reviews the district court's factual findings for clear error, and considers the district court's legal conclusions concerning reasonable suspicion and probable cause de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). The court will give due weight to inferences drawn from those facts by the district court. *Id.* The court may consider both evidence offered at the suppression hearing and the trial. *United States v. Hicks*, 978 F.2d 722, 724-25 (D.C. Cir. 1992) (citing *Carroll v. United States*, 267 U.S. 132, 162 (1925)); *see also United States v. Brown*, 510 F.3d 57, 64 n.6 (1st Cir. 2007); 5 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 11.7(d) (3d ed. 1996).[1]

---

[1] The government relies on *United States v. Harley*, 990 F.2d 1340, 1341 (D.C. Cir. 1993), for the proposition that the court must uphold the district court's legal ruling if any reasonable view of the evidence supports it. However, the *Harley* standard applies only where the district court failed to make factual findings on the record as required by FED. R. CRIM. P. 12(e) but the defendant has waived his Rule 12(e) objection. *Id.* Where, as here, the district court makes the required findings, those findings are reviewed for clear error. *See Ornelas*, 517 U.S. at 699.

The Fourth Amendment prohibits "unreasonable searches and seizures" by law enforcement officials, and this protection extends to a brief investigatory stop of persons or vehicles, whether or not an arrest follows. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411, 417 (1981)). A law enforcement official may effect a brief investigatory stop of an individual if the official has "'a reasonable suspicion, grounded in specific and articulable facts, that a person . . . was involved in or is wanted in connected with a completed felony.'" *United States v. Abdus-Price*, 518 F.3d 926, 929 (D.C. Cir. 2008) (quoting *United States v. Hensley*, 469 U.S. 221, 229 (1985)). Mere generalized inarticulable hunches are insufficient. *Ybarra v. Illinois*, 444 U.S. 85, 92-93 (1979).

According to appellant, the principal bases for reasonable suspicion are a law enforcement official's personal observations, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), and an officer's knowledge that a crime has been committed, *see Hensley*, 469 U.S. at 233-35. However, these are not the exclusive bases. Pursuant to *Terry*, "an officer may briefly detain a citizen if he has a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry*, 392 U.S. at 30). A *Terry* stop requires only a "minimal level of objective justification." *INS v. Delgado*, 466 U.S. 210, 217 (1984). Although an officer does not have articulable suspicion a person is committing a crime merely because a person is in an area of suspected criminal activity, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. An officer may initiate a *Terry* stop based not on certainty but on the need "to 'check out' a reasonable suspicion." *United States v. Clark*, 24 F.3d 299, 303 (D.C. Cir. 1994). Moreover, whether reasonable

suspicion exists depends on the totality of circumstances as "'viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" *Edmonds*, 240 F.3d at 60 (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C. Cir. 1976)); *see United States v. Cortez*, 449 U.S. 411, 418 (1981).

The district court's factual findings are not clearly erroneous. The district court found that undercover officer Watts had previously purchased drugs from Webb in the alley behind Webb's restaurant, that restaurant owners generally do not sell food in alleys behind their restaurants, that Watts's "inference or conclusions were accurate," Tr. May 24, 2005 at 91, that Webb wanted to sell drugs to Watts and was arranging for drugs to be delivered, and that "one could reasonably infer that Webb and [appellant] had previously had a discussion about somebody else having something available, or made available to [appellant]," *id*. The district court concluded that after appellant and Webb walked into the alley, after Webb called Watts and told him a person would soon deliver the product, after a black car arrived in the alley, and after appellant left the alley and drove his car into the alley and parked beside the black car, even though "there are no observations made of what occurs at that time," that "one could reasonably infer that consistent with the purpose that Watts was there, [appellant] was there for the same purpose." *Id.* at 92. The district court also concluded that "one could reasonably infer" appellant left the alley "quickly because he had acquired what he had been there waiting for." *Id*. at 93. The district court further concluded that it "is a reasonable inference to draw" that "a reasonably prudent police officer could believe that what transpired was [appellant] making a purchase of drugs." *Id*. at 92.

Additionally, upon *de novo* review of the district court's inferences from the evidence and its *Terry* analysis, we find no

error. Overall, the district court concluded the evidence "clearly is sufficient to establish articulable suspicion to believe that [appellant] was involved in the same type of activity that Watts was involved in, considering the consistency of what was taking place and the statements that were made by Webb to both Watts and [appellant] prior to the purported transaction." *Id*. at 92-93. The district court further concluded that when Bailey drove out of the alley, "there was, in my view, clearly articulable suspicion to believe that [appellant] was involved in illegal criminal activity." *Id*. at 93. The district court analyzed "what is reasonable and what would a reasonably prudent police officer subjectively believe from the circumstances as they evolved," *id.* at 90, stating with respect to its factual findings that "it is my understanding of *Terry* that that is sufficient to justify a *Terry* contact" and that the police thus "could have stopped the vehicle, and they could have investigated," *id*. at 93-94.

Appellant maintains that there was no basis for reasonable suspicion because appellant and Webb did not mention drugs in the presence of undercover officer Watts, the officers did not recognize the black car or its driver, Watts's previous undercover drug buys had been in a small shed behind the restaurant rather than in the alley behind the restaurant, and no officer observed what appellant did in the alley or whether anyone else was in the alley. But appellant ignores the evidence supporting articulable suspicion that he had just been involved in a drug transaction, and that is all that is required for a *Terry* stop. In *United States v. McKie*, 951 F.2d 399 (D.C. Cir. 1991), the court concluded that "there may well have been reasonable suspicion to justify a stop" of a defendant the officers had observed "walking with and talking to a suspected drug dealer *at the very time and in the very place of the suspected drug dealing*." *Id.* at 402. Hence, the court held that there was reasonable suspicion once the defendant entered the drug dealer's car because that action demonstrated they were "not

mere strangers" and the officers had been tipped that the dealer kept his drug supply in his car. *Id.*

Although appellant distinguishes *McKie* as involving police observation of the dealer and the defendant interacting, the officers observed and recorded appellant and Webb talking and walking together at the time and place Webb was arranging to sell drugs to undercover officer Watts. Appellant unpersuasively attempts to distinguish *McKie* as involving the dealer's car speeding up when the police began following it, because the court in *McKie* did not rely on this in concluding there was reasonable suspicion. As in *McKie*, to the officers on the scene appellant's conduct strongly suggested that Carroll was Webb's supplier and appellant quickly obtained from Carroll that for which he and Watts had come. The circumstances observed by police in this case – appellant talking with Webb, waiting until the black car arrived to drive his car into the alley, and leaving before the black car, which was still parked next to the shed where Watts had bought drugs from Webb in June 2002 – are very similar to the circumstances relied on by the court in *McKie* to hold that there was reasonable suspicion the defendant was involved in criminal activity.

Appellant, like the defendant in *McKie*, emphasizes the seemingly innocuous aspects of his conduct and maintains there was no contact between appellant and Webb after their initial recorded conversation. However, appellant and Webb went into the alley together thereafter and the evidence indicated appellant was on familiar terms with Webb and that he had come to meet Webb, a known drug dealer, at the time and place where Watts had recently bought drugs from Webb and was about to buy drugs from him again. To Watts, it was obvious that appellant, like Watts, was waiting for someone to arrive. Indeed, once Carroll, Webb's apparent supplier, entered the alley, appellant and Webb did too, soon followed by Watts at Webb's invitation.

This evidence provided the "minimal level of objective justification," *Delgado*, 466 U.S. at 217, that appellant had engaged in drug-related activity and a stop was warranted. Appellant's suggestion that there was no basis for reasonable suspicion because he did not flee when he saw the police and did not engage in furtive movements erroneously transforms circumstances attendant to a sufficient finding into a required showing.

Accordingly, we hold that the district court did not err in ruling there was articulable suspicion to stop appellant and properly denied the motion to suppress.

## III.

Appellant also presents a challenge under *Brady v. Maryland*, 373 U.S. 83 (1963), to the district court's alternative ruling that there was probable cause to stop appellant for a traffic violation. This challenge is based on the impeachment value at trial of evidence that the government was unable to locate the ticket that Officer Shaw allegedly wrote in connection with stopping appellant because he ran a stop sign. According to appellant, the lack of any record of the traffic ticket was exculpatory because it not only casts doubt that a traffic violation occurred but also impeached Officer Shaw's testimony. At trial Officer Shaw testified that he "believe[d]" he wrote a ticket for running a stop sign and gave all the copies to Detective Manley. Tr. Jan. 10, 2006 at 103-04. No such ticket was ever produced despite defense requests. Appellant submits the most likely inference is that the ticket never existed. The evidence of its nonexistence, he continues, thus impeaches the only witness who testified he saw a traffic violation. In appellant's view, because he was convicted on the basis of evidence seized from his car, if the traffic stop was not legitimate, then the case against him dissolves. Any evidence

tending to discredit Officer Shaw's testimony was, he maintains, vital to his defense, as in *United States v. Lyons*, 352 F. Supp. 2d 1231 (M.D. Fla. 2004).

To prove a *Brady* violation requires a showing that the evidence at issue is favorable to the accused because it is exculpatory or impeaching, that the evidence was suppressed by the government either willfully or inadvertently, and that the accused was prejudiced. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *United States v. Andrews*, 532 F.3d 900, 905 (D.C. Cir. 2008). To establish prejudice, the withheld material must be "material," i.e., there must be "a reasonable probability" that had the evidence been disclosed to the defense the result of the proceeding would have been different. *Strickler*, 527 U.S. at 280; *Andrews*, 532 F. 3d at 905. Appellant posits that he had a credible argument that there was no traffic infraction and the traffic stop was manufactured. Detective Manley admitted he wanted to stop appellant, and that he called Officers Shaw and Washington so they could make the traffic stop. Detective Manley's instruction to the officers that appellant be stopped for a traffic infraction, appellant suggests, can be viewed as a tacit admission that he knew he did not have probable cause to stop appellant on other grounds. To appellant, the coincidence in the timing of Manley's instruction and Shaw's report that appellant had made a rolling stop at an intersection, is suspicious: Appellant was not acting furtively or suspiciously and did not attempt to run when he saw the police. Further, appellant maintains that Shaw's testimony about being able to see the contents of the paper bag from the passenger's side of appellant's car is questionable because, for example, it is inconsistent with Officer's Delpo's testimony that he could see nothing suspicious from the driver's side of the car.

During cross examination by appellant's trial counsel, Officer Shaw testified that he believed he wrote a traffic ticket

after he stopped appellant. This was the first time Shaw mentioned writing a ticket. Shaw also testified that he thought the ticket "went down" with appellant's arrest paperwork, which included the PD 163 report on the incident. Tr. Jan. 10, 2006 at 104. After the lunch recess, appellant's counsel told the district court that she had not received a copy of the ticket and that the government did not have it. The prosecutor confirmed he had been unable to locate the ticket, noting that unless an officer retained a personal copy there would be no copy three years after the date it was written. Shaw confirmed during voir dire that he did not have a copy of the ticket. Defense counsel moved to strike Shaw's testimony. The district court denied the motion as too severe a sanction absent any indication of the willful destruction of evidence, and stated it would await the government's further efforts to locate the ticket. Defense counsel raised the issue of the missing ticket on two additional occasions during trial but the district court deferred ruling. On the last day of trial, defense counsel submitted a stipulation that no record of the ticket could be found, which the prosecutor joined, and requested a missing evidence instruction.

The district court denied the requested missing evidence instruction on the ground the absence of the ticket would not shed any light on the issue of whether the drugs were found in appellant's car after the stop, and that the issue of the legality of the stop was not before the jury. However, the district court allowed appellants' trial counsel to argue to the jury that it could consider the ticket's absence when assessing Officer Shaw's testimony. During closing argument to the jury counsel, in fact, focused on the lack of credibility of the evidence placing the drugs in appellant's car and mentioned on four occasions the absence of the traffic ticket. The district court, prior to imposing sentence, denied appellant's motion for a new trial, which included the argument that Officer Shaw had not mentioned the traffic ticket at the suppression hearing and that the

government's inability to locate the ticket reflected adversely on Officer Shaw's testimony. The district court referred to its finding of articulable suspicion to stop appellant, noting Watts' testimony and the recorded conversations, which was independent of Officer Shaw's testimony, and to the suppression hearing testimony by Officer Manley and others that "conclusively indicate[d]" that there was a traffic violation when appellant ran a stop sign. Tr. Dec. 22, 2006 at 12.

To the extent appellant contends the undisclosed information would have been useful at the suppression hearing, the issue is moot because the district court correctly ruled  that reasonable suspicion of a drug transaction justified the stop, without regard to the traffic violation. However, as regards the motion for a new trial, we hold that appellant fails to show a *Brady* violation because the inability to locate the traffic ticket was disclosed at trial in sufficient time for appellant to make effective use of the ticket's absence. Although the inability to locate the traffic ticket was not acknowledged by the prosecutor to the jury until the last day of the trial by stipulation that the ticket could not be found, appellant was able to argue the ticket's absence during closing argument to the jury in attacking Officer Shaw's credibility and, indeed, the government's evidence generally regarding the drugs claimed to have been found in appellant's car. *See* Tr. Feb. 8, 2006 at 31, 32, 42, 47. Appellant also could have asked to re-call Officer Shaw to question him further about the apparent discrepancy, but he did not do so.

These circumstances are not unlike the circumstances where this court has rejected claims of prejudice as a result of the government's late *Brady* disclosure. In *Andrews*, 532 F.3d at 904-05, the government did not disclose an agent's handwritten notes from her interview with the defendant, which may have contradicted her subsequent interview report, until the morning

of the fourth day of trial, after the agent had left the witness stand and near the close of the government's case-in-chief. The defendant argued on appeal that this delay "did not leave defense counsel with enough time to use the material properly, to build a responsive defense theory, or effectively impeach" the agent, who would have to have been recalled. *Id.* at 907. The court rejected the argument, concluding that the defendant could have recalled the witness if the alleged discrepancies "were as powerful as she believes they were." *Id.* at 907-08. Similarly, in *United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988), the court concluded that mid-trial disclosure of a government witness's prior contradictory statements did not prejudice the defendant, because "the defense was not foreclosed from arguing any inconsistencies to the jury at a later point in the trial." *Id.* at 1417.

## IV.

At sentencing appellant's trial counsel objected to the application of the career offender provision of the Sentencing Guidelines, § 4B1.1, on the grounds it was unfair because it double counted his convictions. On appeal, he contends that the district court erred in not considering appellant's policy argument. Appellant seeks a remand for resentencing in light of *Kimbrough*, 552 U.S. 85, decided after his sentencing, which held that in a post-*Booker* advisory sentence scheme the district court could reject the Guidelines on policy grounds, *see id.* at 89. Appellant concedes that this court may presume a sentence within the guideline range is reasonable, *see Rita v. United States*, 551 U.S. 338, 351 (2007), and he does not appeal the reasonableness of his life sentence independent of his legal argument that the district court should have rejected the career offender guideline. We conclude appellant has presented "some record showing that the district court misunderstood its sentencing authority" to consider a policy objection under the

Sentencing Guidelines. *United States v. Mouling*, 557 F.3d 658, 668 (D.C. Cir. 2009).

The parties agreed at sentencing that but for application of the career offender sentencing guideline, appellant would have had a base offense level of 26 and a criminal history category of V, which would have resulted in a sentencing guideline range of 110-137 months. Applying § 4B1.1, appellant's offense level was raised to 37 and his criminal history category to VI, resulting in a sentencing guideline range of 360 months to life. At the sentencing hearing, appellant's trial counsel challenged the career offender provision as "unfair" because it "ultimately double-count[s] his convictions" by "essentially double-counting his criminal history to increase the offense level and increase his criminal history again." Tr. Dec. 22, 2006 at 23. When the district court clarified that this objection was "challenging the sentencing guidelines themselves" as unfair rather than challenging the calculation of appellant's sentence, *id.*, the district court stated, "[t]hen I will have to deny that request," *id.* at 24.

Appellant maintains that the "have to" statement indicated that the district court viewed the career offender guideline as mandatory. The government unpersuasively suggests that appellant failed to argue below that the district court wrongly thought that it could not reject the guideline on policy grounds or that the guideline was mandatory, and so our review is for plain error; defense counsel's objection sufficiently alerted the district court to the issue. To the extent the government also maintains that the record does not indicate that the district court viewed the career offender provision as mandatory, appellant persuasively responds that, in view of the policy objection presented, the district court was obligated to state clearly whether it thought the career offender guideline was mandatory. The record shows the district court refused to entertain the

objection, and appellant thus properly relies on *United States v. Vazquez*, 558 F.3d 1224 (11th Cir. 2009), *cert. granted and judgment vacated*, 130 S. Ct. 1135 (2010), where the Supreme Court accepted the Solicitor General's concession of error when the district court refused to consider its disagreement with the career offender sentencing guideline, 558 F.3d 1224, 1228-29 (11th Cir. 2009). The government further notes that the sentencing memoranda of appellant and the government referred to the fact that the Guidelines are advisory rather than mandatory under *United States v. Booker*, 543 U.S. 220 (2005). However, appellant draws a reasonable distinction between knowing the Guidelines are advisory after *Booker* and deciding not to apply the Guidelines in an individual case and, on the other hand, deciding that a particular guideline should be disregarded categorically in all cases because it was bad policy. Finally, anticipating that the government would respond a remand is unnecessary in view of the district court's extensive discussion of its decision to sentence appellant to life in prison, appellant urges this court not to assume on the basis of the current record that the district court would reject his policy challenge. He notes that other district courts have concluded the career offender guideline is unfair, *see*, *e.g*., *United States v. Ragland*, 568 F. Supp. 2d 19, 20 (D.D.C. 2008); *United States v. Phelps*, 366 F. Supp. 2d 580, 590 & n.5 (E.D. Tenn. 2005), and maintains that his criminal record is insufficient to justify a greatly increased sentence from 137 to 150 months to life without parole.

At sentencing the district court discussed the harsh and deleterious effects of appellant's illegal drug activities on the community, and it concluded from appellant's criminal record that he would be "a criminal for the rest of [his] life" and that "there is a place for criminals for the rest of their life, and that is in prison." Tr. Dec. 22, 2006 at 31. Nonetheless it is unclear whether the district court exercised the option afforded by

*Kimbrough* and either rejected appellant's policy objection to § 4B1.1 on the merits or regarded the objection as inappropriate in view of appellant's criminal record. Therefore, we remand the record to the district court to address appellant's policy objections to § 4B1.1 of the Guidelines and to "determine whether it would have imposed a different sentence materially more favorable to the defendant had it been fully aware" of its authority, *United States v. Coles*, 403 F.3d 764, 770 (D.C. Cir. 2005).

**V**.

On remand the district court can address appellant's objection that it failed to issue a promised order in response to appellant's claim that false testimony was presented to the grand jury. The false grand jury testimony was Detective Manley's testimony that undercover officer Watts had seen Webb give drugs to appellant in the alley behind Webb's restaurant, when Watts actually had not been able to see into the alley when appellant was there. At the sentencing hearing, the district court denied appellant's renewed motion to dismiss the indictment because the government represented that the false grand jury testimony had not been presented to the grand jury that indicted appellant. However, the district court stated that it would review *ex parte* the testimony presented to both grand juries, and that "[i]f it is inconsistent with what the government is representing, then I will have to vacate the sentence and come back and revisit the issue, but I assume what the government is saying is accurate and, if that's true, I will issue a written order saying I have reviewed it, and it's consistent with the government's representation." Tr. Dec. 22, 2006 at 19.

The district court has not issued an order either vacating the sentence or confirming the government's representation regarding the false grand jury testimony. Appellant attempted

to request the district court to issue one of the promised orders, but the district court denied the requests because appellant did not submit the request through his trial attorney. Appellate counsel advises this court that appellant also sought to dismiss his appeal without prejudice in order to obtain the ruling, but appellate counsel disagreed and decided to raise the ruling issue on appeal instead. *See* Reply Br. at 25-26. The government suggests appellant is not entitled to the "promised" order and, in any event, this court can resolve the legal question because the false testimony concerned only the conspiracy count of which appellant was acquitted. However, the district court is better situated, in the first instance, to assess whether Detective Manley's testimony was false and if so, whether it had a spillover effect on the grand jury's determinations, *see Tarantino*, 846 F.2d at 1391 (D.C. Cir. 1988). Appellant made attempts to obtain the order, and it can be issued upon remand.

Accordingly, we affirm the judgment of conviction concerning appellant's motion to suppress evidence, but we remand the record to the district court for consideration of appellant's policy objection to § 4B1.1 of the Guidelines, and for a determination of whether resentencing is appropriate as a result, and also to issue the promised order upon review of the grand jury testimony.