# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 7, 2017        Decided March 2, 2018

No. 17-7051

SPANSKI ENTERPRISES, INC.,
APPELLEE

v.

TELEWIZJA POLSKA, S.A.,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00957)

*Andrew L. Deutsch* argued the cause for appellant. With him on the briefs was *Mary E. Gately*.

*Jonathan Zavin* argued the cause and filed the briefs for appellee. *Walter E. Steimel Jr.* entered an appearance.

*Megan Barbero*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* United States of America in support of appellee. With her on the brief were *Mark R. Freeman*, Attorney, and *Sarang Vijay Damle*, General Counsel, U.S. Copyright Office.

2

*Thomas G. Hentoff* and *Connor S. Sullivan* were on the brief for *amici curiae* Disney Enterprises, Inc., et al. in support of appellee.

Before: TATEL, GRIFFITH, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: When the owner of a foreign website, acting abroad, uploads video content in which another party holds exclusive United States public performance rights under the Copyright Act and then directs the uploaded content to United States viewers upon their request, does it commit an infringing "performance" under the Act? If so, is it protected from liability by the principle—unquestioned here—that the Act has no extraterritorial application? Answering these questions "yes" and "no," the district court concluded that Polish broadcaster Telewizja Polska was, by transmitting fifty-one episodes of certain Polish-language television programs into the United States via its online video-on-demand system, liable for infringing copyrights held by a company, Spanski Enterprises, Inc., that enjoys exclusive North and South American performance rights in the episodes. Telewizja Polska appeals this determination, as well as the district court's imposition of statutory damages of $60,000 per episode, for a total of $3,060,000. For the reasons that follow, we affirm as to both liability and damages.

**I.**

Appellant Telewizja Polska, S.A. ("TV Polska"), Poland's national public television broadcaster, owns, operates, and creates content for several Polish-language television channels, including one now called TVP Polonia. TV Polska entered into a licensing agreement with Canadian corporation Spanski Enterprises, Inc. ("Spanski"), appellee here, granting it North

and South American broadcasting rights in TVP Polonia content. Following a legal dispute over the scope of these rights, the parties signed a 2009 settlement agreement establishing that Spanski has the exclusive right to perform TVP Polonia content, including over the internet, in North and South America.

In order to protect Spanski's exclusive rights, TV Polska—which makes its programming publicly available through a video-on-demand feature on its website—employs technology that prevents internet users in North and South America from accessing TVP Polonia content though its website. Known as geoblocking, this technology allows a website owner to digitally embed territorial access restrictions into uploaded content. When an internet-enabled device attempts to access restricted content, the geoblocking system compares the device's unique internet protocol (IP) address to a third-party database that reveals which IP addresses are associated with which countries. If the device's IP address is associated with a country subject to restricted access, the device cannot access the content.

Two groups of TV Polska employees are responsible for ensuring that each episode uploaded to the website is programmed to include the appropriate territorial restrictions. The first group—the audiovisual technicians working in what TV Polska calls its "Workflow System"—converts each episode into one or more digital video formats in accordance with episode-specific instructions they receive from the second group, the program editors working in TV Polska's "Content Management System." For example, such instructions might direct a technician working on a particular episode to create one format that is pay-per-view and one that is not or, as in this case, to create only formats that are geoblocked from specified countries. Even if a technician ignores an instruction to create

a geoblocked format for a given episode in the Workflow System, though, a device with an IP address associated with a given country can access the episode only if the instructions generated in the Content Management System also specify that access from that country is permitted. In other words, an episode is geoblocked either if the technicians working in the Workflow System create only territorially restricted digital formats of that episode or if the program editors assign the episode a territorial restriction in the Content Management System. During the period relevant here, the default territorial access setting assigned to each TVP Polonia episode in the Content Management System was "minus America," meaning that the episode would be automatically geoblocked from devices with North or South American IP addresses unless a program editor affirmatively selected a different instruction from a drop-down menu, regardless of what the technicians did in the Workflow System.

In late 2011, Spanski's attorneys discovered that certain TVP Polonia content was not properly geoblocked, leaving it available to North and South American internet users through TV Polska's video-on-demand system. This content included fifty-one individual episodes that Spanski had registered with the United States Copyright Office and in which it held valid and exclusive United States copyrights. From December 2011 to March 2012, Spanski's attorneys and website developer, between them, viewed each of these fifty-one episodes, at least in part, on TV Polska's website.

Spanski then sued TV Polska in federal district court, asserting its exclusive right under the Copyright Act, 17 U.S.C. § 101 *et seq.*, to "perform" the fifty-one episodes "publicly," *id.* § 106(4). Following a five-day bench trial, the district court found that "the 51 episodes copyrighted by [Spanski] were available and viewed in the [United States] via [TV Polska's]

website" during the period of infringement, *see Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, 222 F. Supp. 3d 95, 105 (D.D.C. 2016), and that "[t]here [was] no evidence that a failure in [TV Polska's] geoblocking system" caused the episodes to become available, *id.* at 108. Rather, the district court found, the episodes became available in the United States because "[TV Polska] employees took . . . volitional action[]" by removing the episodes' default "minus America" territorial restriction in the Content Management System and creating non-geoblocked digital formats of the episodes in the Workflow System. *Id.* at 106.

Based largely on these findings, the district court held TV Polska liable under the Copyright Act for infringing Spanski's exclusive United States performance rights in the fifty-one episodes. *Id.* at 111–12. Observing that Spanski's rights under the Act were "not in dispute," *id.* at 110, the court ruled that even if "the Copyright Act requires volitional conduct by the Defendant for direct infringement to have occurred," *id.* at 112, TV Polska had satisfied that requirement by streaming copyrighted content to United States viewers through its website, *id.* at 111–12. Finally, although assuming that the Copyright Act imposes no liability for infringements that occur abroad, the court concluded that the infringement here "was not wholly extraterritorial" because the episodes at issue were viewed within the United States. *Id.* at 112 n.3 (internal quotation marks omitted).

With liability settled, the district court turned to the issue of damages. Typically, an infringer's per-work liability under the Copyright Act's statutory damages provision is capped at $30,000, *see* 17 U.S.C. § 504(c)(1), but the cap increases to $150,000 where the "infringement was committed willfully," *id.* § 504(c)(2). Here, the district court found, contrary to the sworn denials of "[t]he person in charge of [TV Polska's]

geoblocking system," that TV Polska technicians had created episode formats that lacked geoblocking, *Spanski Enterprises*, 222 F. Supp. 3d at 106, saw "no evidence that a format could be created accidentally," *id.* at 107, and concluded that TV Polska "acted willfully and intentionally to infringe [Spanski's] copyright," *id.* at 106. Further bolstering its inference of intent, the district court found that TV Polska had tried to cover its tracks by abruptly deleting several of the episodes' non-geoblocked formats and then retrospectively altering certain work logs, introduced as evidence, to give the incorrect impression that the episodes had appeared exclusively in geoblocked formats all along. *Id.* at 107–08.

Having thus established TV Polska's eligibility for increased statutory damages, the district court ordered it to pay Spanski $60,000 per infringed episode, for a total of $3,060,000. *Spanski Enterprises, Inc. v. Telewizja Polska S.A.*, No. 12-cv-957, 2017 WL 598465, at *1 (D.D.C. Feb. 14, 2017). This substantial figure was appropriate, the court concluded, because TV Polska's violation was willful and in need of deterrence, it had a "history of infringing [Spanski's] copyright," its deletion of certain records from the relevant period made it impossible to estimate Spanski's actual damages, and it had committed "egregious" manipulation of the evidence. *Id.* at *2.

TV Polska appeals the district court's conclusions as to both liability and damages. "We review the district court's findings of fact for clear error, but resolve issues of law *de novo*," *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1207 (D.C. Cir. 2004) (en banc) (citations omitted), and we review the statutory damages award for abuse of discretion, *see, e.g.*, *Bryant v. Media Right Productions, Inc.*, 603 F.3d 135, 143 (2d Cir. 2010); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 520 (9th Cir. 1985). The United States has filed

an *amicus* brief in support of Spanski on the issue of liability, as has a group of entertainment producers and distributors.

## II.

Liability under the Copyright Act attaches where one party infringes another's valid copyright. *See* 17 U.S.C. § 504(a); *see also Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991) (listing elements of liability as one party's "ownership of a valid copyright" and another party's infringing act). TV Polska contests neither the validity nor the scope of Spanski's rights under the Copyright Act, arguing instead that the district court improperly concluded that it had infringed those rights.

Before considering TV Polska's legal claims, we address its single challenge to the district court's factual findings as to its conduct, namely, that the court clearly erred in finding that its employees "must have volitionally acted to remove territorial restrictions from the 51 Episodes." Appellant's Br. 27. The only support it musters for this position, however, is evidence that some of the episodes at issue had been uploaded in both geoblocked and non-geoblocked formats and that several of the non-geoblocked formats were created only after the period of infringement. These isolated points are nowhere near sufficient to undermine the district court's considered factual findings, which rested on record evidence that the fifty-one episodes had been viewed in the United States and Canada via the TV Polska website, *Spanski Enterprises*, 222 F. Supp. 3d at 103–05, that this could have occurred only if there was "a failure of the geoblocking system[] or a volitional step by a [TV Polska] employee to give access," *id.* at 103, and that the record contained "no evidence that a failure in [TV Polska's] geoblocking system caused the infringement," *id.* at 108.

TV Polska is left, then, with its argument that its conduct did not constitute infringement as a matter of law. According to TV Polska, maintaining a fully automated video-on-demand service cannot constitute a copyright violation because the end user, who ultimately selects which content to view, is alone liable for any infringement. Alternatively, it argues that because its conduct occurred exclusively in Poland, imposing Copyright Act liability on the basis of that conduct would amount to an impermissible extraterritorial application of the Act. We consider these arguments in turn and, like the district court, reject both.

## A.

In support of its first argument—that the transmission of copyrighted content through an online video-on-demand system does not constitute infringement—TV Polska insists that "[p]roof that a defendant's alleged infringing conduct was volitional is a clear requirement of any claim for direct infringement," Appellant's Br. 24, and that such volitional conduct is absent where, as here, a website owner "operates an automatic content delivery system that is not itself infringing, the user, not [the website owner], selects the content it will view or receive and actuates the delivery system, and the user request is not processed by [the website owner's] employees," *id.* at 25.

This argument cannot be squared with the text of the Copyright Act. Among the privileges a copyright holder enjoys under the Act is the exclusive right "to perform [its] copyrighted work publicly." 17 U.S.C. § 106(4). To "perform" an audiovisual work means "to show its images in any sequence or to make the sounds accompanying it audible." *Id.* § 101. To do so publicly means, as relevant, to "transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether

the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." *Id.*; *see also id.* ("To 'transmit' a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent."). Nowhere does the Act state that a work so shown is performed only if a third-party end user plays no role in the showing. Here, because TV Polska "show[ed]" the fifty-one copyrighted episodes "to the public" through its video-on-demand system—"a[] device or process" that rendered "members of the public capable of receiving the performance . . . in separate places and . . . at different times," *id.*—it has violated Spanski's undisputed public performance right.

Even if the statute's text left any room for doubt, the Supreme Court's recent decision in *American Broadcasting Cos. v. Aereo, Inc.*, 134 S. Ct. 2498 (2014), confirms that TV Polska has committed an infringing performance. In that case, the Court held that Aereo, Inc., which ran a service that would, at a user's request, direct antennae to capture broadcast television signals and retransmit them over the internet to the user's computer, *id.* at 2503, infringed the television broadcasters' public performance rights under the Copyright Act, *id.* at 2511. In so holding, the Court relied on the Act's capacious definition of public performance—to reiterate, the "transmi[ssion] . . . to the public" of a work's "images in any sequence," 17 U.S.C. § 101—which Congress added in 1976 specifically to reject two prior Supreme Court decisions holding that community antenna television systems (which, like Aereo, captured signals from broadcasters and transmitted them to end users) were insufficiently similar to traditional broadcasters to publicly "perform" copyrighted material. *See Aereo*, 134 S. Ct. at 2504–06. Under the Act's post-1976 definition, the Court held, "*both* the broadcaster *and* the viewer

of a television program 'perform,' because they both show the program's images and make audible the program's sounds." *Id.* at 2506. Likewise, the Court further observed, an intermediary such as Aereo publicly performs even where its conduct consists only of capturing and retransmitting a broadcast "in automatic response" to an end user's request. *Id.* at 2507.

*Aereo* thus forecloses TV Polska's argument that the automated nature of its video-on-demand system or the end user's role in selecting which content to access insulates it from Copyright Act liability. Indeed, TV Polska played a more active role in performing infringing content than did Aereo. If an automated antenna system that, like Aereo, indiscriminately retransmits third-party content upon a user's request commits an infringing performance where that content happens to be under copyright, then a video-on-demand system, like TV Polska's, that transmits copyrighted episodes purposely selected and uploaded by the system operator surely does the same. Even the *Aereo* dissent recognized as much. *See id.* at 2513 (Scalia, J., dissenting) ("Video-on-demand services . . . respond automatically to user input, but they differ in one crucial respect: *They choose the content* . . . . That selection and arrangement by the service provider constitutes a volitional act directed to specific copyrighted works and thus serves as a basis for direct liability.").

TV Polska offers two reasons for distinguishing *Aereo*. Neither is persuasive.

First, TV Polska points out that, unlike Aereo, which transmitted third-party content, it transmitted only content that it had itself created. But this distinction has no bearing on what it means "to show" a work's "images" to "the public," 17 U.S.C. § 101, whatever the work's origin. Moreover, TV Polska makes no argument that Spanski's status as licensee of

the fifty-one episodes, rather than their creator, affects the scope of its rights under the Copyright Act.

Next, TV Polska seems to suggest that *Aereo*'s interpretation of the Copyright Act was a one-time deal, good for that case only. In support, it emphasizes that in finding an infringing performance, the Court relied on "Aereo's overwhelming likeness to the cable companies" targeted by the amendments that introduced the Act's public performance definition. *Aereo*, 134 S. Ct. at 2507. And, it goes on, the Court declined to opine on how that definition might apply "[i]n other cases involving different kinds of service or technology providers." *Id.* This argument suffers from several fundamental defects.

To begin with, as every first-year law student learns, a judicial decision resolves only the case before it, so it is unsurprising that the Court declined to hypothesize about how its holding would apply to future cases. *See* Karl N. Llewellyn, *The Bramble Bush: The Classic Lectures on the Law and Law School* 39 (Oxford University Press 2008) (1930) ("The court can decide only the particular dispute which is before it. . . . When it speaks to the question before it, it announces law . . . ." (italics omitted)). Such judicial restraint, though, hardly means that *Aereo*'s holding has no applicability outside that case's narrow factual circumstances. As our first-year law student also learns, judicial opinions establish precedential principles that apply to materially similar factual scenarios arising in future cases. *See id.* at 34 ("[T]he decision plus the opinion go far to show what this court that speaks will do again *upon like facts* . . . ."). In *Aereo*, after reviewing the Copyright Act's legislative history, the Court concluded that a viewer's decision to access an infringing television program did not relieve a broadcaster from liability for "show[ing] the program's images and mak[ing] audible the program's sounds." *Aereo*, 134 S. Ct.

at 2506. TV Polska offers no reason why this principle fails to capture its conduct as well. Indeed, as we have just explained, if there is an especially salient distinction between TV Polska's conduct and Aereo's, it is that TV Polska, by selecting as well as transmitting copyrighted content, played an even more active role in broadcasting infringing performances than did Aereo.

Undaunted, TV Polska argues that literal application of the Copyright Act's public performance definition would result in virtually limitless liability. Of course, any website that allows third parties to post content—say, YouTube, Facebook, or even the comments section in the *Washington Post* online—has the capacity to publicly show infringing content. And any internet service provider—say, Comcast or AT&T—that merely allows users to connect to the internet likewise has a hand in communicating infringing performances to the public. Does Twitter unwittingly commit infringement, for example, whenever its users impermissibly post copyrighted images? Or does T-Mobile commit infringement when it allows its customers to access such posts?

Congress has already provided statutory protection against some of these potential ramifications. *See* 17 U.S.C. § 512 (providing statutory defenses for service providers charged with infringement). Several courts have likewise responded to the risk of sweeping liability by requiring copyright plaintiffs to establish "some element of volition" on the part of the alleged infringer or some close causal nexus between the alleged infringer's conduct and the violation of the plaintiff's rights. *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995). Where adopted, this "volitional-conduct requirement" protects website owners and internet service providers that merely "serv[e] as . . . passive conduit[s] for

copyrighted material." *BWP Media USA, Inc. v. T & S Software Associates, Inc.*, 852 F.3d 436, 439 (5th Cir. 2017); *see id.* at 442 (no liability for defendant that "hosts the [online] forum on which infringing content was posted" by others); *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 668 (9th Cir. 2017) (no liability for defendant whose "actions were akin to 'passively storing material at the direction of users in order to make that material available to other users upon request'" (quoting *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004))); *Parker v. Google, Inc.*, 242 F. App'x 833, 836–37 (3d Cir. 2007) (no liability for defendant that maintained an online bulletin board on which third parties posted infringing content).

Our court has yet to decide whether to read such a volitional conduct or proximate cause requirement into the Copyright Act, and we need not do so today. TV Polska's conduct—"us[ing] its own equipment" to "allow[] [users] to watch television programs, many of which are copyrighted," by transmitting content upon a user's request, *Aereo*, 134 S. Ct. at 2506—constitutes infringement under *Aereo*'s binding authority, whatever the scope of any such requirement might otherwise be.

Finally, TV Polska cites two Supreme Court cases, *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), and *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), which, in its view, insulate it from liability. But neither opinion has any clear relevance to this case. In *Sony* and *Grokster*, copyright holders sought to impose liability on the manufacturers or distributors of technology that enabled third parties to commit infringement. *Sony* involved the Betamax video tape recorder—for readers under thirty, a device that allowed users to record a television program for future viewing; *Grokster* involved certain peer-to-peer file-

sharing software. In both cases, the Court concluded that distributing a product that enables infringement "does not constitute contributory infringement if the product is . . . capable of substantial noninfringing uses," *Sony*, 464 U.S. at 442, unless infringement is the product's "principal object," *Grokster*, 545 U.S. at 926. According to TV Polska, its video-on-demand system "is broadly capable of uses that do not infringe any rights of [Spanski]," Appellant's Br. 29, and was not created principally to induce infringement. This argument is beside the point. The district court did not hold TV Polska liable for infringement merely because it maintained a video-on-demand system. Rather, the court concluded—and we agree—that TV Polska's own use of this system to communicate infringing performances amounted to actionable conduct under the Copyright Act.

**B.**

This brings us to TV Polska's argument that even if it did infringe Spanski's copyright, holding it liable for that infringement would constitute an impermissible extraterritorial application of the Act because it did nothing in the United States. Whether an infringing performance that originates abroad but that ultimately reaches viewers in the United States can be actionable under the Copyright Act is a question of first impression in the federal appellate courts.

The Supreme Court recently described "a two-step framework for analyzing" whether a statutory violation that, at least in part, takes place abroad gives rise to liability. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2101 (2016). A court first asks "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* Here, the parties agree that the Copyright Act has no extraterritorial application, and we assume they are correct. *See Tire Engineering & Distribution, LLC v. Shandong Linglong*

*Rubber Co.*, 682 F.3d 292, 306 (4th Cir. 2012) (per curiam) ("As a general matter, the Copyright Act is considered to have no extraterritorial reach."); *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1094 (9th Cir. 1994) (en banc) ("[T]he copyright laws do not apply extraterritorially . . . ."). We therefore move to the second step, which requires us to determine whether this case, notwithstanding its extraterritorial elements, "involves a permissible domestic application" of the Copyright Act. *RJR Nabisco*, 136 S. Ct. at 2101. "[W]e do this," the Court has explained, "by looking to the statute's 'focus,'" *id.*, described as "the objects of the statute's solicitude," or what it is "that the statute seeks to 'regulate'" or protect, *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 136 S. Ct. at 2101.

The Supreme Court recently modeled the "focus" inquiry in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). There, the Court considered whether an Australian bank could be held liable for securities fraud under the Securities Exchange Act of 1934 for the overvaluation of its shares—traded on no American exchange—stemming from misrepresentations made by a Florida-based mortgage-servicing company it had acquired. *Id.* at 251–53. After determining that the relevant statutory provision had no extraterritorial application, *id.* at 265, the Court asked whether the fact that the alleged fraud derived from misrepresentations made in the United States meant that the shareholders who had brought the suit sought to apply the statute domestically, *id.* at

266–70. Observing that the statute punished "only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered,'" *id.* at 266 (quoting 15 U.S.C. § 78j(b)), the Court concluded that "[t]hose purchase-and-sale transactions are the objects of the statute's solicitude," *id.* at 267. Accordingly, "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States." *Id.* at 266.

Guided by the Supreme Court's methodology, we identify the "conduct relevant to the [Copyright Act's] focus," *RJR Nabisco*, 136 S. Ct. at 2101, by asking precisely what it is that the Act regulates. The answer is clear: the Act grants copyright holders several "exclusive rights"—among them, the right "to perform [a] copyrighted work publicly," 17 U.S.C. § 106(4)— and effectuates those rights by prohibiting "infringement," or the "violat[ion]" of those "exclusive rights," *id.* § 501. The Copyright Act "focuses," then, on policing infringement or, put another way, on protecting the exclusivity of the rights it guarantees. Here, although it was in Poland that TV Polska uploaded and digitally formatted the fifty-one episodes, the infringing performances—and consequent violation of Spanski's copyrights—occurred on the computer screens in the United States on which the episodes' "images" were "show[n]." *Id.* § 101. Accordingly, because "the conduct relevant to the statute's focus occurred in the United States," this case "involves a permissible domestic application" of the Copyright Act, "even if other conduct occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101.

Characterizing the statute's focus differently, TV Polska points to *Aereo*'s discussion of the Act's 1976 amendments as establishing that "the 'focus' of the Copyright Act's public performance provisions is prohibition of unauthorized

retransmissions by cable TV systems." Reply Br. 16. TV Polska misunderstands the "focus" inquiry: instead of asking what components of an otherwise actionable statutory violation must occur within the United States to bring it within the Act's domestic sweep, TV Polska rehashes its unsuccessful argument as to what sort of conduct violates the Copyright Act in the first place. Given our conclusion that TV Polska's broadcasts would have been actionable had they been entirely domestic, the relevant question is whether the ultimate performance of those broadcasts on computer screens in the United States was "relevant to [the Copyright Act's] focus." *RJR Nabisco*, 136 S. Ct. at 2101. TV Polska offers no reason to question our understanding that it was.

Alternatively, TV Polska argues that even if the Copyright Act's focus includes, as we have concluded, the infringing performance itself, *Aereo* establishes that its performance occurred abroad. As TV Polska sees it, *Aereo*'s observation that under the Act "*both* the broadcaster *and* the viewer of a television program 'perform'" that program, *Aereo*, 134 S. Ct. at 2506, means that, in the context of an international transmission, there are *two* performances—one by the broadcaster at the foreign point of origin and one by the user at the domestic point of reception. TV Polska overreads *Aereo*, which asks only whether Aereo performed "when a subscriber watche[d] a show using Aereo's system." *Id.* at 2504. Under TV Polska's reading, a broadcaster would commit an infringing performance merely by transmitting a copyrighted work into the void, regardless of whether those transmissions ever result in the work's "images" being "show[n]" to even a single viewer. 17 U.S.C. § 101. Given that the Act defines "perform" (in relevant part) to require such a showing, *see id.*, we think *Aereo* is better read to establish only that a broadcaster and a viewer can *both* be liable for the *same* performance, *i.e.*, the infringing display of copyrighted images on the viewer's

screen. In this case, the infringing performance occurred in the United States.

Congress had good reason to allow domestic copyright holders to enforce their rights against foreign broadcasters who direct infringing performances into the United States. Given the ease of transnational internet transmissions, a statutory scheme that affords copyright holders no protection from such broadcasters would leave the door open to widespread infringement, rendering copyright in works capable of online transmission largely nugatory.

In its *amicus* brief, the United States offers two examples that helpfully illustrate this point. First, it points out that under such a scheme, "large-scale criminal copyright pirates could avoid United States copyright liability simply by locating their servers outside the United States." United States Br. 14. Second, "television stations in San Diego and El Paso could eliminate the need to obtain U.S. copyright licenses simply by moving their broadcast antennae to Tijuana and Ciudad Juarez." *Id.* at 14–15. We agree with the United States that "Congress could not have intended the public-performance right to be susceptible to such ready evasion." *Id.* at 15.

TV Polska offers little response to these troubling consequences of its position, claiming only that foreign enforcement authorities can address such cases. But nothing in the Copyright Act even hints that Congress intended to rely on the uncertain cooperation of foreign governments to ensure that copyright holders are able to enjoy their exclusive statutory rights while in the United States. Nor do we see any relevance to the Supreme Court's statement in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016), that "a potential for international controversy . . . militates against recognizing foreign-injury claims without clear direction from Congress,"

*id.* at 2107; *see also* Reply Br. 18. The violation of a copyright holder's exclusive performance right inside the United States, after all, represents a *domestic* injury.

TV Polska argues that even if the government's concerns are well taken, they lose their force in situations where, as here, the foreign infringers "are lawful copyright owners in their home countries," Reply Br. 22, or where, again as here, the domestic copyright holder is protected by contract and so need not invoke statutory law to protect its interests, *id.* at 24. TV Polska, however, offers no legal grounding for these proposed distinctions. Nor do we see any logical connection between the scope of a broadcaster and copyright holder's respective rights and the question of whether the direction of an infringing performance into the United States from abroad is domestic or extraterritorial.

Attempting to turn the table on the United States, TV Polska argues that treating its conduct as a domestic violation of the Copyright Act would leave any casual internet user anywhere in the world open to liability for uploading copyrighted content to a foreign website whenever anyone in the United States happens to stumble upon it. Indeed, given that "intent is not an element of [copyright] infringement," *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1044 (D.C. Cir. 1981), TV Polska argues, liability could attach where, even though a foreign website owner conscientiously geoblocks the copyrighted material it posts to its website, an American user manages to circumvent the territorial restrictions and views the content domestically. Although we have no occasion to prejudge such situations, we note that foreign defendants in such cases may well have alternative defenses against liability, such as a lack of proximate causation between the foreign conduct and the domestic performance or an American court's lack of personal jurisdiction over the foreign infringer. *See,*

*e.g.*, *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 588 (9th Cir. 1993) (rejecting view of personal jurisdiction that would "render . . . foreign owners of art who sell their products to publications[] amenable to personal jurisdiction [on copyright claims] in every state in which their art eventually is displayed"). For present purposes, we need hold only that a foreign broadcaster that, as here, directs infringing performances into the United States from abroad commits a domestic violation of the Copyright Act.

Finally, the decisions TV Polska cites for the proposition that "acts committed abroad cannot form the basis for a U.S. copyright infringement suit," Appellant's Br. 33, hold nothing of the sort. Instead, they indicate only that infringements that, unlike the performances at issue here, occur abroad cannot in most cases generate Copyright Act liability. *See Subafilms*, 24 F.3d at 1098 (extraterritoriality doctrine barred liability for distribution of allegedly infringing videos abroad); *Luar Music Corp. v. Universal Music Group, Inc.*, 861 F. Supp. 2d 30, 38–40 (D.P.R. 2012) (extraterritoriality doctrine barred liability for releasing an allegedly infringing sound recording abroad). Indeed, Spanski and the United States point to multiple district court decisions holding, as do we, that an infringing performance that originates abroad but terminates in the United States constitutes a domestic Copyright Act violation. *See, e.g.*, *Crunchyroll, Inc. v. Pledge*, No. C 11-2334, 2014 WL 1347492, at \*17 (N.D. Cal. Mar. 31, 2014) (defendant who copied and uploaded copyrighted television episodes while in United Kingdom could be liable where those episodes were transmitted to United States viewers); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 225 (S.D.N.Y. 2002) (rejecting Canadian website owner's extraterritoriality defense because infringing material posted on the site was viewed in the United States).

In passing the Copyright Act, Congress bestowed on copyright holders a specific set of rights. Holding foreign actors liable for conduct that results in the domestic infringement of those rights effectuates the Act's guarantees and fully coheres with principles of extraterritoriality as articulated by the Supreme Court.

## III.

Having concluded that the district court properly held TV Polska liable for copyright infringement, we turn to TV Polska's challenges to the $3,060,000 damages award. Recall that the district court found TV Polska eligible for statutory damages of $60,000 per episode because its infringement was "willful," and that it based the total damages award on its finding that TV Polska infringed all fifty-one episodes. *Spanski Enterprises*, 2017 WL 598465, at \*2. TV Polska challenges both the willfulness finding and the finding as to the number of episodes it infringed. Mindful that "an appellant seeking reversal of a trial court's findings of fact in a bench trial faces a daunting task," *Overby v. National Ass'n of Letter Carriers*, 595 F.3d 1290, 1293 (D.C. Cir. 2010), prevailing only if no reasonable factfinder could have reached the district court's conclusion, *id.* at 1294, we reject both challenges.

### Willfulness

TV Polska attempts to evade clear-error review by arguing that a *de novo* standard ought to apply because the Federal Circuit employs such a standard when reviewing a district court's willfulness finding in patent infringement cases. *See Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1006–07 (Fed. Cir. 2012). TV Polska overlooks that the Federal Circuit case law limits the application of this review standard to an objective component of the willfulness inquiry under patent law that the Supreme

Court has recently abrogated. *See Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1930, 1932–34 (2016). The district court here made a factual finding as to TV Polska's subjective intent. Like most factual findings, we review this one for clear error. *See Microsoft Corp.*, 373 F.3d at 1207 (reviewing factual findings for clear error); *see also*, *e.g.*, *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001) ("We review . . . findings of willfulness [under the Copyright Act] under the same deferential . . . standard that applies to factual determinations pertinent to liability.").

The district court found that TV Polska deliberately removed geoblocking from the fifty-one episodes at issue, was aware of Spanski's exclusive right to broadcast those episodes in the United States, and took purposeful after-the-fact steps to hide its conduct. *See Spanski Enterprises*, 222 F. Supp. 3d at 106–08. It requires no great leap from these factual predicates to arrive at the conclusion that TV Polska knew that its conduct was infringing. *Cf. United States v. Bailey*, 622 F.3d 1, 5 (D.C. Cir. 2010) (clear error standard requires reviewing court to "give due weight to inferences drawn from . . . facts by the district court").

TV Polska points to testimony by a Deputy Director in its Technology Department who professed ignorance as to United States copyright law. It also argues that neither the licensing agreement nor Spanski itself gave it express notice that Spanski held copyright in the licensed episodes. But TV Polska pressed both points at trial, and the district court found them unpersuasive. TV Polska has given us no basis for upsetting the district court's reasonable finding, based on ample evidence of misconduct, that TV Polska knew it was up to no good. And to the extent TV Polska argues that the district court committed legal error by supposedly concluding that willfulness requires only "intentional conduct that amounts to infringement,"

Appellant's Br. 41, rather than the specific intent to violate protected rights, it fails to account for the district court's express finding that TV Polska "could not have been ignorant to the fact *it was infringing* [*Spanski's*] *copyright*." *Spanski Enterprises*, 222 F. Supp. 3d at 113 (emphasis added).

## Number of Episodes Infringed

TV Polska concedes that thirty-six of the fifty-one episodes were viewed in the United States, but contends that the district court clearly erred in finding that the remaining fifteen were similarly viewed. The district court based its finding principally on the testimony of one of Spanski's attorneys, who kept a contemporaneous log of the episodes—including the fifty-one at issue here—he had viewed on the TV Polska website. At trial, the lawyer testified that during the infringement period he "streamed each" of the fifty-one episodes on his computer in New York "to make sure they were available" on the website. Trial Tr. 200 (Feb. 23, 2016), Joint Appendix (J.A.) 481.

Attempting to undermine the force of the lawyer's testimony, TV Polska highlights his statement that he had no specific recollection at the time of trial—four years after the fact—of having watched all fifty-one episodes, as well as his inability to say that he "definitely" checked each episode to ensure that it was streaming. *Id.* at 201, J.A. 482. It further observes that the lawyer's testimony suggests that he entered some of the episodes into his log before ensuring that those episodes could actually be streamed. To be sure, these points of uncertainty might well be powerful at trial. But TV Polska made these arguments to the district court, and that court concluded that although the witness "may not have had specific recollections of viewing each individual episode," his testimony, taken together with other evidence including

contemporaneous screenshots from the TV Polska website and testimony from one of Spanski's contractors, "was sufficient to show that the [fifty-one] episodes were available for viewing and viewed in the [United States]." *Spanski Enterprises*, 222 F. Supp. 3d at 103. Perhaps we would arrive at a different conclusion were we considering the lawyer's testimony in the first instance, or perhaps not. The critical point is that the district court, which heard the testimony firsthand, arrived at a supportable conclusion that we have no basis for upsetting. *Cf. United States v. Jones*, 744 F.3d 1362, 1367 (D.C. Cir. 2014) ("We give especially strong deference to [a district court's] credibility determinations . . . .").

## IV.

To sum up, then, we hold that where a foreign broadcaster uploads copyrighted content to its website and directs that content onto a computer screen in the United States at a user's request, the broadcaster commits an actionable domestic violation of the Copyright Act. Consistent with this view of the law, the district court, based on its supportable factual findings, found TV Polska liable for infringing Spanski's copyrights in the fifty-one episodes and concluded that damages of $60,000 per episode were appropriate in light of the circumstances. Seeing no basis for upsetting these considered judgments, we affirm as to both liability and damages.

*So ordered.*